**HIRAM CLARKE CIVIC CLUB, INC.,**
etc., et al., Plaintiffs-Appellants,

**v.**

**James T. LYNN, Individually and as Secretary of the Department of Housing & Urban Development, et al., Defendants-Appellees, Libo, Inc., Intervenor-Defendant-Appellee.**

No. 72–1268.

United States Court of Appeals,
Fifth Circuit.

April 3, 1973.

---

Hellmut A. Erwing, O. K. Jerden, Houston, Tex., for plaintiffs-appellants.

Anthony J. P. Farris, U. S. Atty., Jack Shepherd, Chief Asst. U. S. Atty., Theo W. Pinson, III, James R. Gough, Asst. U. S. Attys., W. Edwin Denman, Vernon E. Fewell, Houston, Tex., Kent Frizell, Asst. Atty. Gen., Edmund B. Clark, Larry G. Gutterridge, Attys., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, and MOORE * and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this action appellants seek to enjoin the federal funding of a proposed low and moderate income apartment project in Houston, Texas. Appellants contend that the failure of the Department of Housing and Urban Development to file an environmental impact statement bars it from further funding of the project. The District Court denied injunctive and declaratory relief. We affirm, holding that the threshold determination made by HUD not to file an environmental impact statement under the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4321 et seq. was not unreasonable and must therefore be upheld. *See* Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973).

The proposed project against which this action is directed is a 272-unit apartment complex to be known as the Artistocrat Apartments and to be constructed on a fifteen acre tract near West Airport Boulevard and Hiram Clarke Road in Houston, Texas. The es-

* Hon. Leonard P. Moore, Senior Circuit Judge of the Second Circuit, sitting by designation.

timated cost of the project is some $4,181,330, and a loan to the private developer, approximately $3,763,200, is to be insured by HUD under Section 236 of the National Housing Act, 12 U.S.C.A. § 1715z–1(j), which provides federal mortgage insurance for housing projects designed for low and moderate income residents. The apartments have an average value of $15,400 and the project contains courtyards, open spaces, children's playgrounds, a swimming pool, and a 6,500 square-foot community center.

Appellants, homeowners in the immediate area surrounding the site of the proposed apartments, initially opposed the project through local zoning boards and other governmental administrative bodies. Finding no success, appellants then challenged the HUD funding decision. On appeal, as in the District Court, they contend first, that HUD failed to comply with its own regulations implementing NEPA and second, that, even if HUD's actions complied with its own regulations, the requirements of the Act itself remain unfulfilled.

## I.

Under NEPA, Congress has established a system of procedures for federal agencies to follow in making decisions that might have an impact on the environment. Section 102(2)(C) of the Act, 42 U.S.C.A. § 4332(2)(C), which sets out the concept of the environmental impact statement, requires that "all agencies of the Federal Government shall . . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a detailed statement on the proposed action's environmental effects.[1] This rather general legislative language received explication in the interim guidelines of April, 1970, published by the Council on Environmental Quality, the agency established by Title II of NEPA, 42 U.S.C.A. §§ 4341–4347, to serve as a research, resource, and advisory body in the Executive Office of the President of the United States. These guidelines became final, without important alteration, in April, 1971. Section 3 of the guidelines directed federal agencies to promulgate

1. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\*　　\*　　\*　　\*　　\*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

42 U.S.C.A. § 4332.

their own procedures for "identifying those agency actions requiring environmental statements . . . ." Council on Environmental Quality, Guidelines § 3, 36 Fed.Reg. 7724 (April 23, 1971). Section 5(a)(ii) defines "action" as including projects supported in whole or in part by federal loans, subsidies, or other forms of funding assistance. Guidelines, *supra*, § 5(a)(ii), 36 Fed. Reg. 7724 (1971).

▇ These CEQ guidelines are merely advisory, because the CEQ does not have the authority to prescribe regulations governing compliance with NEPA. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972). Following these CEQ guidelines, however, HUD published Circular 1390.1 setting forth the detailed procedures that it would employ for screening all HUD projects to insure its compliance with the Act as to each project.

HUD Circular 1390.1 established certain "thresholds" that are used to isolate those projects that may be major federal actions significantly affecting the quality of the human environment. A project passing the first threshold is then given special environmental consideration and study. This means that the project must be thoroughly investigated, and the HUD office involved must either file a "negative statement," indicating that approval of the project application is consistent with established HUD policy and standards and that it would have

no significant adverse effect on the environment or, if unresolved environmental issues or concerns remain, must draft and circulate a detailed environmental impact statement.

The "threshold concept" used to screen proposed applications of the kind under review here establishes the rule that proposed apartment projects of one hundred or more units require a "Special Environmental Clearance." Additionally, paragraph 3 of HUD Circular 1390.1, Appendix A, states that "controversial" or "precedent-making" HUD projects must be given "Special Environmental Clearance."[2]

The precise question before us, then, is whether HUD complied with the mandate of NEPA and with its own guidelines.

The standard for reviewing HUD's decision has been explicated by this Court in our recent opinion in Save Our Ten Acres v. Kreger, *supra*. In *SOTA*, we held that the decision of a federal agency not to file an environmental impact statement, when reviewed by the courts, should be tested by a stricter "reasonableness standard," instead of by the well-settled rule that, in the absence of fraud, administrative findings of fact are conclusive if supported by any substantial record evidence. This more penetrating standard is necessary because "[t]he spirit of [NEPA] would die aborning if a facile, ex parte decision that the project was minor or did

---

2. Paragraph 3 states:
   "*Special Environmental Clearance*" *for projects and major changes:* That additional review of environmental consequences which shall be applied to larger size projects or projects with greater environmental significance (including all projects above thresholds in Appendix A) and to projects which are *controversial* with regard to whether or not HUD and other appropriate environmental policies and standards are being met, or *precedent-making* in the sense that important environmental circumstances are not treated in HUD's central office guidance documents. For this purpose, the HUD Environmental Clearance Worksheet (see Appendix B)

is suggested. All special environmental clearances shall result in either (a) a *negative statement* signed by the head of the HUD field office (or his designated Environmental Clearance Officer), indicating that approval of the application is consistent with established HUD policy and standards and would have no significant adverse effect on the environment, or (b) if there are still unresolved environmental issues and concerns, the drafting and circulating of a *102(2)(C) environmental statement*. A negative statement or a 102(2)(C) environmental statement shall become part of the application file and shall accompany the application through the HUD review and decision process.

not significantly affect the environment were too well shielded from impartial review." *SOTA*, at page 466.

■ This case, though, differs from the *SOTA* case in the procedures and standards employed by the District Court to evaluate HUD's determination that an environmental impact statement was not required. Unlike in *SOTA*, where the District Court denied relief solely on the basis of its review of the agency's administrative record, the District Court here conducted a full-scale trial on the issue, hearing witnesses and taking evidence from parties involved. Hence, the District Court's decision here rests upon two independent bases: the record of HUD's considerations and the Court's own findings. This is not to say, though, that this procedure is mandatory whenever someone challenges an agency's failure to file an environmental impact statement. Rather, as we said in *SOTA*, only if a plaintiff raises substantial environmental issues should a court proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects that would significantly affect our environmental quality. Only if the plaintiff can show an inadequate evidentiary development before the agency should the District Court supplement the deficient administrative record by taking evidence on the environmental impact of the project.

■ We reiterate, as we stated in *SOTA*, that it is not the province of the courts to review the agency decision on the merits as to the desirability *vel non* of the proposed project. Instead,

> it is the courts' function to insure that the mandate of the statute [NEPA] has been carried out and that all relevant environmental effects of the project be given appropriate consideration by the responsible official *whenever it is unreasonable to conclude that the project is without the purview of the Act.*

*SOTA, supra,* at page 467 (emphasis added).

## II.

On December 1, 1969, the private developer, LIBO, Inc., applied to HUD for federal mortgage insurance available under Section 236 of the National Housing Act, 12 U.S.C.A. § 1715z–1(j). On July 16, 1971, HUD issued a Firm Commitment to assist the proposed project, promising to supply both federal loan insurance and mortgage payment subsidies.

NEPA became effective on January 1, 1970, and on April 30, 1970, the interim guidelines for implementing NEPA were issued. As we have pointed out earlier, these guidelines were issued in final form, with only minor changes, on April 23, 1971. On June 19, 1970, HUD issued a memorandum establishing interim internal procedures for implementing NEPA. Specific policies and procedures applicable to HUD offices in the Fort Worth Region were established by HUD Circular FW 1300.2, issued March 1, 1971, and received by the Houston HUD office on March 15, 1971. This Circular introduced the "threshold" and "negative statement" concepts. On July 16, 1971, HUD issued Circular 1390.1 establishing nationwide departmental policies governing the implementation of NEPA, including specific "threshold" and "negative statement" procedures. On September 21, 1971, CEQ General Counsel approved HUD's "negative statement" procedures.

Appellants filed their complaint on October 18, 1971. At this time, the Houston HUD office reviewed the entire project for the second time. Although the project had been in the HUD "pipeline" prior to the effective date of NEPA and before HUD Circular FW 1300.2, paragraph 3, directed that there must be evidence of "significantly adverse" environmental impact before the provisions of HUD Circular 1390.1 (the HUD Circular implementing NEPA) apply to applications in the HUD "pipeline" prior to March 15, 1971, the Hous-

ton HUD office, nevertheless, worked up a "Special Environmental Clearance."

Under the direction of the Multi-Family Appraiser, a HUD "Environmental Clearance Worksheet" was prepared, considering population density and distribution, adequacy of sewer and water facilities, vehicular traffic, ingress and egress, noxious odors, inharmonious property uses, deteriorating neighborhood influences, adequacy of community support facilities, location in relation to the general area, the proposed management plan for maintaining the apartments, and the value of the property and the kind of development that could otherwise be expected on the property.

This "Worksheet" was reviewed by the same officials who had previously evaluated it, the Chief Valuator, the Chief Architect, and the Multi-Family Coordinator, but this time with special emphasis on environmental impact. Their review concluded that the proposed project would not produce the significant environmental impact contemplated by NEPA. The Chief Underwriter and Environmental Clearance Officer then prepared a "negative impact" statement. After full staff consultation, the Director of the Houston HUD office concurred in the "negative statement."

■ After a careful examination of the trial testimony and the supporting HUD documents, we conclude that the District Court correctly held that, as a matter of law, HUD was not required by NEPA to file an environmental impact statement covering the proposed apartment project. Although the District Court here did not have the benefit of our opinion in *SOTA* when it reviewed the HUD decision, its findings amply support the agency decision. As the Director of the Houston HUD office testified, appellants have raised no environmental factors, either beneficial or adverse, that were not considered by HUD before it concluded that this apartment project would produce no significant environmental impact. On this record, then, it was not unreasonable for HUD

to determine that an environmental impact statement was not required.

Appellants argue that the HUD actions here do not comply with the final CEQ Guidelines. They especially contend that Section 5(b) of the Guidelines, 36 Fed.Reg. 7724 (1971), which requires that an environmental impact statement be prepared where the proposed federal action "is likely to be highly controversial," requires HUD to file an environmental impact statement here. Apart from the question of what constitutes a "highly controversial" federal action, a question which must surely be answered in the negative in this case, appellants misperceive the authority of the CEQ Guidelines. Unlike agency regulations, which have the force of law, these Guidelines are merely advisory because the CEQ was not given authority to prescribe regulations governing compliance with NEPA. Greene County Planning Board v. FPC, *supra*.

■ Appellants next contend that HUD's standard of determining "significant effect" incorrectly equates "significant" with "adverse." Appellants argue that HUD's determination was necessarily based on an incomplete investigation, since HUD was concerned only with *adverse* impact. They point to CEQ Guideline 5(c), which states:

Section 101(b) of the Act indicates the broad range of aspects of the environment to be surveyed in any assessment of significant effect.

36 Fed.Reg. at 7725 (1971). Once again, though, possible HUD noncompliance with CEQ Guidelines raises no legal issue. But the deeper question remains of whether this HUD practice, that of determining that an environmental impact statement is unnecessary if no *adverse* environmental effects can be forecast for the federal action in question, complies with NEPA. Appellants argue that NEPA requires that an agency file an environmental impact statement if *any* significant environmental effects, whether adverse or beneficial, are forecast. Thus, they argue, by con-

sidering only *adverse* effects HUD in effect did but one-half the proper investigation. We think this contention raises serious questions about the adequacy of the investigatory basis underlying the HUD decision not to file an environmental impact statement. A close reading of Section 102(2)(C) in its entirety discloses that Congress was not only concerned with just adverse effects but with *all* potential environmental effects that affect the quality of the human environment.

Nevertheless, any deficiency in this HUD procedure does not require the preparation of an environmental impact statement for this project. The District Court in a full evidentiary hearing fully explored the controlling factors and concluded that the project in question was not a major federal action significantly affecting the quality of the human environment within the Congressional meaning of the National Environmental Policy Act.

Affirmed.