**Eva SIMMANS et al., Plaintiffs,**

**v.**

**Kenneth GRANT, Administrator, Soil Conservation Service, et al., Defendants.**

**Civ. A. No. 73–H–927.**

United States District Court, S. D. Texas, Houston Division.

Jan. 22, 1974.

---

Robert L. Burns, Sears & Burns, Houston, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., William Bowers, Charles B. Wolfe, Asst. U. S. Attys., Houston Tex., for Kenneth Grant, Earl L. Butz, William D. Davey and Frank B. Elliott.

Bill M. Payne, Lawrence, Thornton, Payne & Watson, Bryan, Tex., for Brazos-Robertson Soil and Water Conservation Dist. and Brazos County Water Control and Improvement Dist. No. 1, Big Creek.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

### I.

### The Environmental Contentions

The plaintiffs bring a class action against the defendants, particularly the Soil Conservation Service (SCS) of the U. S. Department of Agriculture,[1] seeking to enjoin further construction of a channel improvement project located in Brazos County, Texas. It is alleged that the defendants have failed to comply with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq., by reason of their failure to prepare an environmental impact statement. The law is still developing regarding the duties and responsibilities of federal agencies

---

1. In addition to the named representative of the SCS are named defendant representatives of the Farmers Home Administration, the Brazos-Robertson County Soil Conservation District (the District), and the Brazos County Water Control and Improvement District # 1, Big Creek. The record does not indicate the claimed role of the Farmers Home Administration. The latter two agencies are political subdivisions of the State of Texas.

with respect to "negative declarations", those determinations that the environmental aspects of a project are so slight that a detailed impact statement is not compelled by NEPA. As the opinion will indicate, this Court concludes that no impact statement is required. However, because of the failure of the SCS to prepare an adequate negative declaration, some equitable relief is required and granted.

The channel improvements being challenged involve the Big Creek Slough in Brazos County, Texas. In its natural state the Slough is a well defined depression in the bottomlands between the Navasota and Brazos Rivers. It drains water from some surrounding fields and higher lands into the Navasota River which, in turn, empties into the Brazos River. Part of the project involves construction of a reservoir, known as Big Creek Watershed Site 6, which will cover an estimated 8 to 30 acres of land and for which a reservoir excavation contract totaling $75,000 has been awarded. The part upon which the plaintiffs focus primary attention involves a proposed deepening of the natural channel in Big Creek Slough and its laterals over a total length of approximately 11 miles accompanied by the placement of grade stabilization structures to facilitate the runoff of water. The natural stream bed will generally be lowered 3 to 7 feet and widened in some areas. The channel width will vary from a minimum of 6 feet to a maximum of 40 feet. The channel walls will have an inside slope of 2:1 with an outside slope of 10:1 for stabilization. The maximum width of the channel across the top will be approximately 80 feet with additional "spoil" areas erected on each side for structural stabilization. Such spoil areas from which ground foliage is stripped and on which reinforcing soil is placed will vary in width from 70 to 240

feet. At some locations the spoil reportedly is to be placed primarily on one side only where the SCS seeks to avoid damage to particular stands of trees. A total of approximately 237 acres of land will be cleared for the project for which a channel excavation contract of approximately $220,000 has been awarded. The SCS is to bear all costs initially, subject to reimbursement for 11.25 percent of the channel improvements on the Slough and 25.80 percent on the laterals by the Brazos-Robertson County Soil Conservation District (the District) in a manner not revealed in the record.

Testimony was heard for two full days by this Court[2] during which time substantial evidence regarding the expected environmental impact of the proposed projects was presented. Along the Slough are numerous stands of trees which grow in or immediately adjacent to the channel. These areas generally provide habitat for a variety of fauna, provide some hunting benefits, and also reportedly provide shade for cattle raised by some plaintiffs, this shade being characterized as essential for proper livestock development. The Slough is generally devoid of water although some retention occurs behind a beaver dam and at several low points in the channel bed, certain of which are man-made. Minimal fishing benefits are provided for fish which are trapped or stocked in the various water holes.

The particular points of contention between the parties are surprisingly few. The plaintiffs contend that the project would eliminate virtually all of the stands of trees, pointing out that the construction contract awarded does not identify or discuss preservation of such trees. Ergo, it is claimed that virtually all fauna related to that habitat would be imperiled. The plaintiffs object to the elimination of the water-collection points, which are utilized by cattle, as

2. Due to scheduling difficulties, the second day of the hearing was held one week later. During the interval, various witnesses visited the project site to refresh their recollections regarding issues which arose during the first day of the hearing. This provided the Court with particularly current observations and arguments regarding many environmental features.

well as the elimination of several low-water crossings used by cattle and vehicles. Most of these crossings are constructed of large steel pipes laid lengthwise in the stream bed and covered by dirt, although apparently one crossing is an uncovered wooden bridge. It is alleged by the defendants, without documentary support, that the District has agreed to build a total of six 40,000 pound capacity bridges across the Slough at sites designated by plaintiffs and at no cost to them. The plaintiffs contend that the District does not have the financial resources to build the bridges in the immediately foreseeable future, and they have submitted copies of District financial records which appear to support this contention. The plaintiffs further criticize the defendants for their failure to utilize proper procedures in arriving at a reasonable environmental conclusion. They contend that the environmental assessment was limited to a view of the fish and wildlife habitat, while omitting serious consideration of such environmental problems as sedimentation, insecticide and herbicide transmission into the Navasota River (draining off farmlands surrounding the Slough), and the effect of the project on adjoining land and landowners.[3] Substantially the same argument is raised by the Natural Resources Defense Council, appearing *amicus curiae* by leave of Court, which also claims that alternatives to this project have not been fully considered by the SCS.

The defendants disagree with the various characterizations advanced by the plaintiffs. While not conceding that the project is a "major Federal action", they contend that there will be no "significant" environmental impact, thus eliminating the obligation to prepare an impact statement.

## II.

### *The SCS Project History*

The original workplan for the channel and reservoir projects was completed by the District and SCS in June, 1962,[4] with minor revisions being made in 1966.[5] The project was to be constructed under the Watershed Protection and Flood Prevention Act, 16 U.S.C. § 1001 et seq. In February, 1971, following the passage of NEPA, the SCS issued Watershed Memorandum–108 (WS–108) entitled "Guidelines for Planning and Review of Channel Improvement". These guidelines were to be used for evaluating projects approved, but not yet installed. They provided, in part:

Channel improvement is to be planned and carried out with minimum losses to fish and wildlife habitat . . . . Losses are to be minimized by (1) selecting measures that are least damaging to habitat, (2) incorporating design features to reduce the damaging effect of the measures, (3) locating measures to avoid areas of high habitat value, (4) using construction methods that minimize disturbance and destruction of habitat, (5) vegetating denuded areas as quickly as practical, and (6) operating and maintaining measures in a way that is least damaging to the habitat. Unavoidable losses are to be mitigated to the maximum practicable degree. Plans should provide the same degree of certainty that mitigation measures will be installed, operated, and maintained as they do for other structural measures.[6]

---

3. *Plaintiffs' Memorandum in Support of Interim Relief*, at 13.

4. *Work Plan, Big Creek Watershed, Brazos County, Texas, April, 1962*, between Soil Conservation Service of U.S. Department of Agriculture, and Brazos-Robertson Soil Conservation District and Brazos County Water Control and Improvement District # 1, Big

Creek. [Admitted into evidence as Plaintiffs' Exhibit # 5.]

5. *Minor Revision, Watershed Work Plan, Big Creek Watershed, Brazos County, Texas, December, 1966.* [Admitted into evidence as Plaintiffs' Exhibit # 6.]

6. *Watersheds Memorandum–108, United States Department of Agriculture, Soil Con-

Following the requirements of WS–108, the State conservationist, the ranking SCS official for Texas, appointed a project reviewing committee [7] to consider each project within the State, classifying them either in Group 1 (minor or no known adverse environmental impact), or Group 2 (some adverse impact), or Group 3 (serious adverse impact). According to testimony presented at the hearing, it was the belief of Texas SCS officials in 1971 that WS–108 compelled preparation of environmental impact statements only for Group 3 projects and for those particular projects in Group 2 believed to warrant it on a case by case determination.

On March 26, 1971, the Texas State Conservationist distributed to all Texas Area Conservationists certain instructions requiring the completion of an environmental questionnaire for each planned channel improvement project.[8] The questionnaires, which were intended to aid compliance with the review requirements of WS–108, were to be completed and returned no later than May 7, 1971. This timetable allowed less than 46 days for what was essentially the environmental re-assessment of all channel improvement programs within Texas. The completed questionnaire on Big Creek Watershed Channel Improvement, dated April 27, 1971,[9] was accomplished by a person or persons unknown who reportedly made an on-site inspection. It was reported that the project would cause no adverse effect upon wildlife,

fishing or habitat. The only impact noted was that approximately 40 percent of the trees in the flood plain would be destroyed, these consisting mostly of willow trees in the channel bottom. Testimony at the hearing, including that of SCS officials, rebutted the report's conclusions in several material respects. Without detailing the testimony, it appears to this Court that either the questionnaire was completed in haste following a superficial survey of the project site, or that it was done by someone basically unfamiliar with the environmental problems involved.

Following this review, the state project reviewing committee placed the Big Creek Slough project in Group 1. The Texas Department of Parks and Wildlife as well as the U.S. Department of the Interior were of the opinion the project should be placed in Group 2 because of its environmental impact. The record does not reveal the precise objections raised by these agencies. In any event, an additional study was performed by an SCS staff biologist and other officials. This study resulted in a decision by the SCS to shift the centerline of the proposed channel so as to bypass and thereby preserve most major habitat areas. The SCS also agreed to implement a vegetative plan to mitigate wildlife loss and to provide stabilization and erosion control. Relying upon written SCS assurances that the changes would be carried out,[10] the Texas Department of Parks and Wildlife agreed to a "reclassi-

---

servation Service, at 1–2 (February 4, 1971). [Admitted into evidence as Defendants' Exhibit # 9.]

7. This committee was composed of the Assistant SCS State Conservationist for Watersheds, the SCS State Conservation Engineer, and the SCS Resource Conservationist. They were to be given assistance by other SCS officials as needed, including an agricultural economist, a land rights specialist, a hydraulics engineer, a geologist, a soils mechanic engineer, and/or a design engineer. Memo from Clyde W. Graham, State Conservationist to various area conservationists, dated March 11, 1971. [Admitted into evidence as Defendants' Exhibit #10.]

8. WS–Memorandum–108, Review of Channel Improvement in Approved Watershed Work Plans, Texas, March 26, 1971. [Admitted into evidence as Defendants' Exhibit # 11.]

9. This questionnaire, entitled "Questionnaire for Making Channel Review in Accordance with WS–108, Texas, Big Creek Watershed, Channel or Segment and Length: Big Creek, Big Creek Slough & Laterals 128,830 ft.", was admitted into evidence as Defendants' Exhibit # 12.

10. Letter from Clyde W. Graham, SCS State Conservationist, to James U. Cross, Executive Director, Texas Parks and Wildlife Department, March 22, 1972. [Admitted into evidence as Defendants' Exhibit # 17.]

fication" of the project to Group 1 on April 6, 1972,[11] with the Department of the Interior following suit on May 23, 1972.[12] Construction contracts were awarded May 17 and 18, 1973. Channel clearing evidently began shortly thereafter which ultimately resulted in the filing of this suit on July 11, 1973.

### III.

#### *Jurisdiction*

▉ Jurisdiction over the federal defendants, which is not contested, is properly founded on 28 U.S.C. § 1331(a)(Federal question) as well as 5 U.S.C. § 701 et seq. (Administrative Procedure Act). Jurisdiction also properly lies as to the two state agency defendants who do contest jurisdiction. They have voluntarily entered into a joint venture with a federal agency to build a project which potentially may impinge upon the environment. They have made various assurances to the federal agency, taken numerous actions as a prerequisite to federal participation, and will reap substantial benefits from the efforts of the federal agency. Under such circumstances jurisdiction lies. Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1028 (5th Cir. 1971). *See also*, Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971), rehearing denied with opinion, 455 F.2d 1122; Daly v. Volpe, 350 F. Supp. 252 (W.D.Wash.1972).

### IV.

#### *Burden of Proof*

▉ The law is not settled as to which party bears the burden of proof in environmental cases in which a federal agency determines that no impact statement is required. The Fifth Cir-

cuit Court of Appeals has placed the initial burden upon the plaintiff to show some deficiency before judicial action is appropriate. *See* Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 425 (5th Cir. 1973) (hereinafter cited as *Hiram Clarke*). This Court concludes that in this type of case, as well as in those cases in which prepared impact statements are being challenged, the burden of proof should initially rest upon the plaintiff to make a prima facie showing that the Federal agency has failed to adhere to the requirements of NEPA. Once this has been done, the burden will shift, as a general rule, to the federal agency which possesses the labor, public resources and expertise to make the proper environmental assessment and to support it by a preponderance of the evidence. *See* Sierra Club v. Froehlke, 359 F.Supp. 1289, 1334–1335 (S.D.Tex.1973).

### V.

#### *Standard of Judicial Review*

▉ The Fifth Circuit Court of Appeals has held that the decision of a federal agency not to file an environmental impact statement should be tested by a "reasonableness standard", rather then by a rule that, in the absence of fraud, administrative findings of fact are to be viewed as conclusive if supported by substantial evidence in the record. Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 (5th Cir. 1973) [hereinafter cited as *SOTA*]. Applying this standard to the facts before it, the Court of Appeals stated:

> If the court concludes that no environmental factor would be significantly degraded by the project, [the agency's] determination not to file the impact statement should be upheld. On the other hand, if the court finds that the project may cause a significant

---

11. Letter of James U. Cross to Clyde W. Graham, April 6, 1972. [Admitted into evidence as Defendants' Exhibit # 18.]

12. Letter from William White, Acting Regional Director, Bureau of Sport Fisheries and Wildlife, U. S. Department of the Interior, to Clyde W. Graham, May 23, 1972. [Admitted into evidence as Defendants' Exhibit # 19.]

degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant [the plaintiff] such other equitable relief as it deems appropriate.

*SOTA, supra,* 472 F.2d at 467. The Fifth Circuit Court of Appeals subsequently elaborated upon the test, indicating that at least three factors should be kept in mind by a reviewing district court: (1) only if the plaintiff can show an inadequate evidentiary development before the agency should the court take evidence on the environmental impact for the purpose of supplementing the administrative record; (2) if the plaintiff raises "substantial environmental issues" the court should proceed to examine and weigh all the evidence in determining whether the agency's conclusion was reasonable that the project would have no significant environmental impact; and (3) it is not the province of the court to review the agency decision on the merits as to the desirability *vel non* of the project. *Hiram Clarke, supra,* 476 F.2d at 425.

## VI.

### Federal, Major, Significant

The courts and the Council on Environmental Quality have identified as many as four elements which must be present before NEPA compels the preparation of an environmental impact statement. These elements, which as a practical matter are not fully independent of one another and which occasionally have been combined by a court with one or more other elements, are: (1) that the action be or involve "Federal" action; (2) that the project be a "major" Federal action; (3) that it have a "significant" environmental impact; and (4) that the impact be upon the quality of the "human" environment, either directly or indirectly. *See* Hanly

v. Mitchell, 460 F.2d 640, 644 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); SCRAP v. United States, 346 F.Supp. 189, 199 (D.D.C. 1972) (three-judge court), rev'd on other grounds, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 366 (E.D.N.C.1972); CEQ Guideline § 1500.6(c), 38 Fed.Reg. 20550, 20552 (1973), *to be codified* as 40 CFR § 1500.6(c). For example, the question of whether or not "Federal" action (or inaction) had occurred might be pertinent in a situation where a proposed Federal-state project was artificially divided into parts, some of which had significant environmental impacts; if a federal agency assumed full economic responsibility for the portion having little environmental impact with knowledge that the state would thus be enabled to assume full economic burden of the remainder, closer judicial scrutiny might be appropriate. Similarly, the issues as to whether a project is "major" or involves a "significant" impact are not necessarily unrelated. As one environmental writer noted, "the cases . . . have never held that the small size of a federal project will exempt it from NEPA if its environmental effects are significant".[13]

### The Test of "Major" Federal Action

The courts have not articulated a uniform test to date for determining whether or not a particular Federal action is "major". Consequently, the most practicable approach is to consider the issue on a case-by case determination. There are some factors to which a court may look. It has been held that a "major federal action" is one that requires substantial planning, time, resources or expenditure. Citizens Organized to Defend Environment, Inc. v. Volpe, 353 F. Supp. 520, 540 (S.D.Ohio 1972); Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 366–367 (E.D. N.C.1972). The fact that an action,

---

13. F. Anderson, NEPA in the Courts, A Legal Analysis of the National Environmental Policy Act at 74 (Johns Hopkins University Press, 1973).

which would otherwise be major, is only temporary in nature does not necessarily disqualify it as being "major". *See* SCRAP v. United States, 346 F.Supp. 189, 199 (D.D.C.1972) (three-judge court) (temporary four-month surcharge of 2.5 percent on railroad freight charges allowed by I.C.C.), rev'd on other grounds, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). It is possible that a given determination may involve an inquiry into the actions of two or more federal agencies, each one of which played a different role in the final project. *See, e. g.,* Upper Pecos Association v. Stans, 328 F.Supp. 332 (D.N.M.), aff'd, 452 F.2d 1233, 10th Cir. 1971) (forest road construction to be funded by Economic Development Administration of Department of Commerce in economically depressed area, right of way easement to be granted by Forest Service). To a great extent the determination of whether a project is "major" relies upon an inquiry into whether the federal action, whatever it may be, is the precipitating cause of the resultant environmental impact, regardless of who or what may actually have caused the impact. If "but for" the federal action the impact would not have resulted, then the federal action might be found to be "major". For example, the grant or denial of licenses by federal agencies may be such a precipitating action, even though the actual investment of federal planning, time, resources and expenditures may be minimal. *See, e. g.,* Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971) (permits to construct or operate nuclear power plants); City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972) (authorization by I.C.C. for railroad to abandon service on 1.8 miles of track); Kalur v. Resor, 335 F.Supp. 1 (D.D.C.1971) (Corps of Engineers permits for depositing refuse into navigable waters). In somewhat related fashion, the nature of the resultant impact in and of itself may provide insight into whether the action is "major". For example, road or highway construction contributing "to an immediate, commanding or powerful increase in the usage of [an] existing or connecting roadway" is likely to be a major action. Kisner v. Butz, 350 F.Supp. 310, 323 (N.D.W.Va.1972). *See also* Scherr v. Volpe, 466 F.2d 1027, 1033 (7th Cir. 1972). On the other hand, the completion of 4.3 miles of gravel road on a well-traveled route through a forest costing approximately $320,000 is not "major". Kisner v. Butz, supra, 350 F. Supp. at 323.

■ The Environmental Protection Agency has not promulgated guidelines to aid in determining whether or not a given project is a "major" Federal action. The Council on Environmental Quality has provided some assistance, although the applicable guideline does not separate "major" from "significant";

The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated . . . . In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable.

CEQ Guideline § 1500.6(a), 38 Fed.Reg. 20550, 20551 (1973), *to be codified* as 40 CFR § 1500.6(a). Actually, the SCS has promulgated regulations which provide substantially more guidance for its own operations than those of the EPA or CEQ.

The term "major Federal actions" relating to Soil Conservation Service activities includes technical and financial assistance on watershed projects and resource conservation and development project measures (except for routine erosion and sediment control measures). It also includes measures

installed on private lands under any SCS program for which the measures are, in the judgment of the State conservationist, likely to have a significant impact on the environment or may result in public interest and possible controversy.[14]

Regulations of this nature are binding upon the issuing agency. *See* Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421 (5th Cir. 1973); Scherr v. Volpe, 466 F.2d 1027, 1032 (7th Cir. 1972); Daly v. Volpe, 350 F.Supp. 252, 258 & n. 18 (W.D.Wash.1972).

*The Test of a "Significant" Impact*

 The law surrounding whether or not an expected environmental impact is "significant" has developed more fully than that pertaining to the foregoing elements. The Second Circuit Court of Appeals, in what appears to be the most articulate summary to date, has stated:

In the absence of any Congressional or administrative interpretation of the term, we are persuaded that in deciding whether a major federal action will "significantly" affect the quality of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumula-

tive harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change . . . . For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless public park.

Hanly v. Kleindienst, 471 F.2d 823, 830–831 (2d Cir. 1972). While consideration should be given to the "cumulative effects on the quality of the human environment", Goose Hollow Foothills League v. Romney, 334 F.Supp. 877, 879–880 (D.Ore.1971), the Fifth Circuit Court of Appeals has pointed out that attention also needs to be focused upon the possibility of some "significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all)". Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 (5th Cir. 1973). The impact of a proposed project upon the quality of life of those persons living immediately adjacent to it must be closely considered. *See* Hanly v. Mitchell, 460 F.2d 640, 646–647 (2d Cir. 1972), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (increased potential for neighborhood crime due to presence of narcotic addict treatment center); Hanly v. Kleindienst, 471 F.2d 823, 834 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (same); Saunders v. Washington Metropolitan

14. Soil Conservation Service Environmental Memorandum–1, Supplement 1, November 15, 1971. Environmental Law Reporter, Stat. & Admin.Materials 46063 (Fed.1972) [App. at 2]. This Court was unable to locate any indication that SCS environmental guidelines of which this was a part were published in the *Federal Register*.

Proposed SCS regulations appear to utilize a different approach for determining *when* an impact statement is required than determining whether or not a particular project is "major". Impact statements are "normally" prepared for all watershed projects or resource,

conservation, and development (RC&D) measures which: (1) require approval by congressional committees; (2) provide for modification of channel alignment or capacity of any perennial stream, including standing or backwater channels; or (3) are expected to be highly controversial. Other SCS assisted actions for which impact statements may be required are those which generally are found by the agency to have a "significant adverse affect" upon the environment. Proposed SCS Guideline § 650.8, 38 Fed.Reg. 31909, 31911–12 (1973), *to be codified* as 7 CFR § 650.8.

Area Transit Authority, 359 F.Supp. 457, 460 (D.D.C.1973) (construction of surface-level subway vents displace trees or grass and increase noise level). Nevertheless, neighborhood opposition, standing alone, does not compel a finding of significant impact. *See* Citizens for Reid State Park v. Laird, 336 F. Supp. 783 (D.Me.1972). Judicial attention to subtle, but significant, influences upon the environment may also be appropriate in given cases. *See, e. g.,* SCRAP v. United States, 346 F.Supp. 189 (D.D.C.1972) (three-judge court) (increased railroad rates found to boost cost of shipping recyclable materials, thus aggravating pre-existing disparity in shipping costs between those materials and the primary goods with which they compete), rev'd on other grounds, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

The Council on Environmental Quality has provided guidelines for evaluating impact "significance" which commingle somewhat with those used for measuring whether or not a project is "major". The guidelines do provide some additional assistance, however.

[NEPA] also indicates that adverse significant effects include those that degrade the quality of the environment, curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals. Significant effects can also include actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. Significant effects also include secondary effects . . . . *The significance of a proposed action may also vary with the setting, with the result that an action that would have little impact in an urban area may be significant in a rural setting or vice versa.* (emphasis added)

CEQ Guideline § 1500.6(b), 38 Fed.Reg. 20550, 20551 (1973), *to be codified* as 40 CFR § 1500.6(b). *See also* Proposed EPA Reg. § 6.20(a), 38 Fed.Reg. 1696, 1698 (1973), *to be codified* as 40 CFR § 6.20(a). As the above guidelines point out, each project should be viewed and considered in its own context in an effort to determine the environmental impact of the proposed project from a cumulative perspective as well as with an eye to individual human environmental factors. In either case the effect should be considered within the setting of the project. The "setting" selected should neither be artificially large, thus diluting the actual impact on the immediate area, nor should an involved project or complex of related projects be artificially "segmented" whereby individually minor impacts are not studied in their cumulative role.[15]

SCS proposed guidelines identify some environmental factors which should be considered with respect to each project or planning measure "as appropriate" to assist in determining whether or not an impact is "significant". They are: upland wildlife habitat, bottomland wildlife habitat, migration routes, bottomland hardwoods, stream fisheries including potential not presently productive, wetlands, rare or endangered animals and plants, natural perennial streams, man-altered perennial streams, natural intermittent streams, man-altered intermittent streams, archeological and historical resources, water quantity, water quality and appearance of the landscape. Additionally, consideration is given to the degree of public interest, potential controversy, urban or rural setting, economic and social impacts, and the relative area or impact of each of the foregoing factors and amenities to the total resources in the planning area which will be affected. Proposed SCS Guideline § 650.-8(b)(1), 38 Fed.Reg. 31909, 31911–12 (1973), *to be codified* as 7 CFR § 650.-8(b)(1).

15. *See* Sierra Club v. Froehlke, 359 F.Supp. 1289, 1323 & n. 110 (S.D.Tex.1973).

## VII.

### Negative Declarations and NEPA

The Fifth Circuit Court of Appeals has twice considered challenges to federal agency determinations that no environmental impact statements were required. Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421 (5th Cir. 1973); Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973). However, neither case provides ready answers to all of the issues in the present case before this Court. The Second Circuit Court of Appeals, in what appears to date to be the most complete exposition of appropriate standards in this field, has provided some further direction. See Hanly v. Mitchell, 460 F.2d 640 (2d Cir.) [Hanly I], cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); on appeal following remand, Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972) [Hanly II], cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); on appeal following second remand, Hanly v. Kleindienst, 484 F.2d 448 (2d Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3392 (U.S. Jan. 8, 1974) (No. 73–913).

 ██ Initially, even though no formal impact statement is thought to be necessary, NEPA requires an agency to develop affirmatively a reviewable environmental record. Hanly I, supra, 460 F.2d at 647; Scherr v. Volpe, 466 F.2d 1027, 1032 (7th Cir. 1972). In January 1972, the Environmental Protection Agency issued proposed regulations governing the preparation of such a record. These regulations, since implemented, require the preparation of a "negative declaration", a brief statement reciting that a named agency has determined that a named project will not have a significant environmental impact and that no environmental impact statement will be prepared. More significant to our concern here, the negative declaration must be accompanied by a separate document entitled "environmental impact appraisal" wherein the following items are to be considered and summarized:

(1) brief description of project;

(2) probable impact of the project on the environment;

(3) any probable adverse environmental effects which cannot be avoided;

(4) alternatives considered with evaluations of each;

(5) relationship between local short-term uses of environment and maintenance and enhancement of long-term productivity;

(6) an irreversible and irretrievable commitment of resources;

(7) public objections to project, if any, and their resolution;

(8) agencies consulted about the project;

(9) reasons for concluding there will be no significant impacts.[16]

What is actually required under NEPA and these regulations is that the federal agency prepare a "mini" environmental analysis after consultation with the appropriate agencies and authorities, although obviously not in the same detail as a regular environmental impact statement. See Hanly II, supra, 471 F.2d at 832. Without such a record it is impossible for a district court to determine whether or not the agency has complied with Sections 102(2)(A), (B), and (D) of NEPA, 42 U.S.C. §§ 4332(2)(A), (B) and (D). See Hanly II, supra, 471 F. 2d at 834. Briefly summarized, the requirements of these sections of NEPA are as follows:

(a) § 102(2)(A): A systematic, interdisciplinary approach must be utilized to ensure that in arriving at the conclu-

---

16. Proposed EPA Reg. § 6.31, 37 Fed.Reg. 879, 882 (1972), to have been codified as 40 CFR § 6.31. These proposed requirements became effective February 16, 1973. See EPA Interim Reg. § 6.25, 38 Fed.Reg. 1696, 1699 (1973), and Exhibit 5, 38 Fed.Reg. 1696, 1711, to be codified as 40 CFR § 6.25. The SCS has recently proposed regulations also requiring the preparation of a negative declaration; however, they fail to incorporate the EPA requirements noted in the text of this opinion. See Proposed SCS Reg. § 650.8(b)(3), 38 Fed.Reg. 31909, 31912 (1973), to be codified as 7 CFR § 650.8(b)(3).

sion that no impact statement is required, no significant environmental factor is overlooked. This assists in the intelligent balancing of environmental, technical and economic factors.

(b) § 102(2)(B): The agency must identify and develop methods and procedures of review which will give appropriate consideration to presently unquantified environmental amenities. This should include the sending of some form of notice to and communication with the affected public regarding the proposed action. Consideration of relevant facts and comments offered by the public is necessary. See Hanly II, 471 F.2d at 836. See also EPA Interim Reg. § 6.40, 38 Fed.Reg. 1696, 1700–01 (1973), to be codified as 40 CFR § 6.40. The facts and circumstances of each case will necessarily govern the breadth of this requirement.

(c) § 102(2)(D): There must be some consideration and discussion of appropriate alternatives to the proposed project or its more objectionable features. Associated with this evaluation is the degree of mitigation, if any, undertaken by the agency in association with the project. As noted earlier, WS–108 requires the SCS to ensure that:

> [u]navoidable losses are to be mitigated to the maximum practicable degree. Opportunities for mitigation should be fully explored. Plans should provide the same degree of certainty that mitigation measures will be installed, operated, and maintained as they do for other structural measures.[17]

Thus, in the same manner that EPA regulations require identification of mitigation measures in impact statements,[18] such measures should also be identified in environmental impact appraisals accompanying a "negative declaration". In light of NEPA's requirement that federal agencies under some circumstances must mitigate some and possibly all environmental impacts arising from a proposed project, it is only proper that the appraisal prepared by the agency spell out fully what form of mitigation compliance is intended. See Sierra Club v. Froehlke, 359 F.Supp. 1289, 1339–1341 (S.D.Tex.1973).

The preparation of a negative declaration, with accompanying environmental appraisal, saves the sponsoring agency time and expense which would be required in the preparation of a formal impact statement and also eliminates the necessity of preparing draft impact statements to be circulated to the appropriate federal agencies and interested parties prior to its final completion.

## VIII.

### Deficiencies of SCS Big Creek Slough Review

#### Lack of Reviewable Record

The most serious deficiency noted in this case is the absence of a reviewable environmental record prepared by the SCS explaining how it reached its environmental conclusions. Had this Court prior to the hearing been made aware of the EPA regulations requiring an agency to prepare a negative declaration accompanied by an environmental appraisal, this Court might well have granted an injunction without a hearing pending completion of such a document. A court should not be obligated to do by hearing what the agencies are legally obliged to do in documentary form. An added benefit of having agency conclusions precisely spelled out in such a form is their availability for review by the public and other federal agencies.

#### Lack of Inter-disciplinary Review

As pointed out by the Natural Resources Defense Council, appearing amicus curiae by leave of Court, the SCS failed to consult with several agencies having jurisdiction by law or expertise over waterway and stream modifica-

---

17. See note 6 supra and accompanying text.

18. EPA Interim Reg. § 6.32(b)(2), 38 Fed. Reg. 1696, 1700 (1973), to be codified as 40 CFR § 6.32(b)(2).

tion projects as established by Guidelines of the Council on Environmental Quality. While the SCS did consult with the Texas Department of Parks and Wildlife, the only federal agency contacted was the Bureau of Sport Fisheries and Wildlife. The SCS made no effort to touch base with and, where appropriate, to consider the views of other agencies under whose jurisdiction the project conceivably might fall before rendering a final environmental assessment. These include the Army Corps of Engineers, Bureau of Reclamation, Geological Survey, U.S. Coast Guard, Water Resources Counsel, Environmental Protection Agency, Forest Service Bureau of Land Management, Bureau of Outdoor Recreation, or the Water Resources Council as required by the CEQ.[19] Such lack of consultation discloses a failure of the SCS to employ a systematic, interdisciplinary approach to environmental evaluation as required by Section 102(2)(A), 42 U.S.C. § 4332(2)(A) of NEPA. The obvious purpose for requiring such consultations is to obtain all views from interested agencies and thereby ensure an intelligent assessment of the "significance" of the project's environmental impact. *See* CEQ Guideline § 1500.6(b), 38 Fed.Reg. 20550, 20552 (1973), *to be codified* as 40 CFR § 1500.6(b). This inter-agency contact is necessary and must, in fact, be a true "consultation". *See* Sierra Club v. Froehlke, 359 F.Supp. 1289, 1346 (S.D. Tex.1973).

The record before this Court suggests that there has been little or no opportunity afforded to the public to express views on the project, and, indeed, it appears that little, if any, project information was publicly disseminated to those most likely to be affected. SCS regulations now reportedly require that at least two public meetings be held for new proposed projects in the planning stages.[20] It may be noted that the Subcommittee of the U.S. House Committee on Governmental Operations, describing the nation-wide pattern of SCS review procedures under WS–108, has reported that "the SCS review procedure has been structured to exclude participation by the public".[21] This observation would seem to be applicable to the present project. Failure of the SCS to provide adequate opportunity for public review and understanding of the project as well as failure to obtain the various opinions of the citizens affected underscore the absence of appropriate agency methods and procedures geared to give consideration to presently unquantified environmental amenities as required by Section 102(2)(B), 42 U.S.C. § 4332(2)(B). In this instance a primary complaint which the SCS might have discovered through employment of such procedures was the project's impact, if any, upon cattle raising and those persons dependent upon this pursuit for their economic well-being in the affected area.

This Court was also struck by what appeared to be a significant lack of familiarity on the part of key SCS officials with the requirements of NEPA, which they are obligated by law to recognize and follow. These include how SCS environmental determinations are generally made, and, more specifically, how the final environmental decision was made in this instance to place this particular

19. *Compare* CEQ Guidelines, App. II, 38 Fed.Reg. 20550, 20558.59 (1973) *with* CEQ Proposed Guidelines, App. II, 38 Fed.Reg. 10856, 10863 (1973) and CEQ Guidelines, App. II, 36 Fed.Reg. 7724, 7728–29 (1971).

20. One meeting is scheduled following completion of a preliminary investigation and prior to the formal agency approval of beginning detailed planning on the project. The second is held after tentative agreement on a plan has been reached with local sponsors. Watersheds Memorandum–104, issued May 1, 1970, reportedly requires this. *See* Stream Channelization, Hearings Before a Subcommittee of the House Committee on Governmental Operations 2850, 93d Cong. 1st Sess., pt. 5 (Mar. 20, 1973) [hereinafter cited as Hearings] [included in Appendix to Plaintiffs' Memorandum in Support of Interim Injunctive Relief at 24] [hereinafter cited as App.].

21. *See* Hearings, *supra* note 20, at 2790 [App. at 9].

project in Group 1. For example, the State Conservation Engineer of Texas testified that it was not his responsibility to determine when an impact statement should be prepared. This official is ultimately responsible for the designing and construction of projects from an engineering standpoint. His lack of familiarity with the methods whereby recommended mitigation measures are screened and approved, when impact statements are to be filed, and how environmental balances are struck suggests that the SCS has made little, if any, effort to incorporate into its procedures a bona fide interdisciplinary approach aimed at the resolution of environmental problems. The present Assistant State Conservationist testified that he did not know who went into the field to fill out the environmental questionnaire pertaining to this project. He was unable to indicate the methods used by the project's reviewing committee in this instance other than to assure the Court that all environmental factors were appropriately considered. The SCS State Biologist whose survey now constitutes the cornerstone of SCS project modifications was unable definitely to advise the Court whether some or all of his recommendations had been adopted until he conducted an additional on-site inspection concurrent with the hearing in this Court. Section 102(2)(A), 42 U.S.C. § 4332(2)(A) necessitates closer coordination between engineering, economic and environmental experts within an agency (in order to ensure that an appropriate balancing of interests may be reached) than appears to have occurred on this project to date.

### Lack of Project Definiteness

As indicated earlier, the SCS agreed to make certain modifications in the proposed project in order to eliminate expressed opposition to a Group 1 classification by the two other agencies which had been consulted.[22] These modifications were based primarily upon the report and recommendations of SCS Field Specialist-Biologist Vernon L. Hicks.[23] This Court has closely studied the evidence including the assurances of the SCS concerning the proposed course of action and is satisfied that the modifications, if carried out as planned, would result in little adverse environmental impact. It also appears from the record that the plaintiffs' views are not inconsistent with such a modified objective.

What remains after hearing the proof adduced in this case is the need for a written document or summary reciting in relative detail the proposed modifications which will be implemented. It should be pointed out therein which will be performed by local sponsors or contractors and which will be performed by the SCS, although the SCS will ultimately be responsible for ensuring that all modifications are carried out as planned. This summary will provide the details for what would normally constitute the mitigation section of an environmental appraisal intended to accompany a negative declaration. Without such a precise documentary record as is here required, it becomes most difficult for a district court to know when the agency has fully complied with NEPA in completing the project.

### IX.

#### Conclusion

▮ The failure of a federal agency, such as the SCS, to prepare a negative declaration with accompanying appraisal in lieu of a full scale environmental impact statement would normally justify injunctive relief until such time as the appropriate record has been prepared. This Court believes that such relief may be granted without a hearing and does not read *SOTA, supra,* 472 F.2d 463, or *Hiram Clarke, supra,* 476 F.2d 421, as compelling a different course of action. However, the Court in this instance exercised its discretion and held a hearing primarily because of the unsettled state

---

22. *See* notes 10–12 *supra* and accompanying text.

23. Admitted into the record as Defendants' Exhibit # 16.

of the law in this area. Accordingly, a record has been made which serves to satisfy certain of the requisites of such a negative declaration.

 The Court is satisfied after hearing the evidence that the Big Creek Slough project should be regarded as being both a "major" and a "federal" action. It has been in the planning stages since 1962 and has involved substantial federal investment of time and manpower in the preparation of studies, contracts, surveys and environmental evaluations. While the only federal dollar value expressed in the record is the approximately $275,000 total value in awarded construction contracts, the value of the federal time and labor involved may well raise that figure substantially. The SCS is fully absorbing initial project costs, subject to future partial reimbursement by the District. This Court also notes that the SCS has been the primary motivating force behind this project since its inception.

The defendants do not contend that the project is not "federal", although they do not concede that it is "major". This Court believes that on balance it would be inappropriate to hold that NEPA, which was intended to set a commendable standard for federal agency conduct, would be inapplicable to a project of this character on the theory that it was not "major"; this project is obviously only one of many similar projects being undertaken by the SCS in Texas under a common plan. Where a major portion of a federal agency's time, personnel, equipment, facilities and expertise is being applied in like fashion to similar projects statewide, there would seem to be "major" federal action as it pertains to that type of project, regardless of whether or not the projects are physically inter-related and whether or not a particular project has a "significant" environmental impact.[24]

With respect to the "significant" environmental impact of the project, the Court reaches a different conclusion. The record as developed at the hearing clearly shows that there will be no significant impact if the project as modified is completed as the SCS represents. This being so, the SCS decision not to prepare a formal environmental impact statement was not erroneous. What is clear is that the SCS failed to comply in such an instance with existing law and regulations calling for preparation of a negative declaration and its accompanying environmental appraisal. Such documentation would have eliminated the existing procedural deficiencies and lack of project definiteness. However, this Court is reluctant to enjoin further construction while the SCS prepares these documents, since the detailed record forthcoming as a consequence of this Court's hearing can readily substitute for much of the noticeably absent environmental record.

 The Court is, basically concerned at this stage with the absence of documentary support for the claimed project modifications which comprise the bulk of the environmental mitigation for this project. Under the circumstances of this case, some equitable re-

24. Chopping up or segmenting federal projects for the purpose of making components appear to have no significant impact or appear to be less than a "major" action would be impermissible under NEPA. *See* note 15 *supra* and accompanying text. There is nothing in this record to suggest that the SCS has done so here. This Court concludes from the present record that notwithstanding the fact that projects similar in nature might be regarded separately in determining whether or not their environmental impact is "significant", they may be considered together in determining whether or not the sponsoring federal agency is engaged in "major" federal action with respect to the type of project at issue, e. g., channel improvement projects. As is true in numerous instances in this new legal area, it will require appellate review to determine whether this distinction is valid, or if it constitutes only an exercise in semantics. Fortunately, its resolution does not control the result in this case.

lief is appropriate. *See SOTA, supra,* 472 F.2d at 467.

Accordingly, the Court orders as follows:

1. The defendants may resume immediate construction on the project, subject to further orders of this Court, if necessary.

2. Concurrent with such resumption, the defendants will confer with plaintiffs and promptly prepare for Court approval and entry within thirty (30) days a documentary summary of all mitigation measures to be implemented on this project including, but not limited to, the following:

(a) the identification in sufficient detail of each general area to be preserved as taken from those recommendations of Vernon Hicks which received SCS approval;

(b) a description of what provisions, if any, will be made for removed channel crossings, both during and after construction activities, identifying each by reference to the owner(s) thereof and/or its location;

(c) a description of what provisions, if any, will be made for eliminated sources of water supply necessary for cattle (provisions need not be made if adequate water provisions are reasonably available elsewhere);

(d) reference, where necessary, to contracts, surveys, reports, etc., necessary to a graphic understanding of the nature and scope of the planned construction;

(e) any other matters believed necessary or appropriate by the defendants.

Plaintiffs will be furnished copies of such summary and may submit objections, if necessary, to the summary when it is filed. It is contemplated, however, that agreement between the parties will be reached.

3. The Court will retain jurisdiction pending completion of the project or until such time as it appears appropriate to enter a final order or decree.