573 F.2d 201
 11 ERC 1673, 8 Envtl. L. Rep. 20,445
 TEXAS COMMITTEE ON NATURAL RESOURCES, Plaintiff-Appellee,
v.
Robert BERGLAND, Secretary of Agriculture of the United
States, et al., Defendants-Appellants,
Texas Forestry Association et al., Intervenors-Appellants.
 No. 77-2671.
 United States Court of Appeals,
Fifth Circuit.
 May 8, 1978.
Rehearing and Rehearing En Banc Denied June 22, 1978.
 
 Roby Hadden, U. S. Atty., C. Houston Abel, Asst. U. S. Atty., Tyler, Tex., Robert Klarquist, James Moorman, AAG, Edmond Clark, Chief, Land & Nat. Resources Div., Dept. of Justice, Washington, D. C., Elbert A. Cole, Dept. of Agriculture, Temple, Tex., for defendants-appellants.
 James R. Cornelius, Jr., Lufkin, Tex., Richard Brooks, James Ulmer, Lawrence McNamara, Michael Skelton, Houston, Tex., Kenzy Hallmark, Lufkin, Tex., for Texas Forestry Ass'n.
 Bill Kugle, Athens, Tex., Helene Linker, John Robert Beers, James B. Frankel, Palo Alto, Cal., for plaintiff-appellee.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before THORNBERRY, GOLDBERG and RONEY, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 The United States owns approximately 662,000 acres of national forest land in East Texas. This East Texas forest land is divided into four distinct and spatially separate forests San Houston National Forest, Angelina National Forest, Sabine National Forest and Davy Crockett National Forest. The land available for timber management purposes within these national forests is administered by the United States Forest Service. Plaintiff in this action, Texas Committee on Natural Resources,[1] sued defendant Bergland, the Secretary of Agriculture, and others[2] in charge of national forests located in Texas[3] alleging that the Forest Service's failure to file an environmental impact statement with respect to even-aged timber management was in violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. A number of lumber companies[4] and the Texas Forestry Association were permitted to intervene in the district court. The district court held that the Forest Service had unreasonably concluded that the use of any even-aged management system in Texas national forests did not require an environmental impact statement and that the Forest Service should be enjoined from permitting any cuts designed to regenerate even-aged stands of timber until it had prepared a programmatic environmental impact statement, approved by the court and filed with the Council on Environmental Quality. Texas Committee on Natural Resources v. Bergland, 433 F.Supp. 1235 (E.D.Tex.1977). The district court also found that an environmental impact statement filed on the Conroe Unit of the Sam Houston National Forest was insufficient. We hold that the district court erred in its judgment that a programmatic environmental impact statement was required, in finding the Conroe impact statement insufficient and in its grant of injunctive relief. We also find that the provisions of the NEPA and the NFMA are not irreconcilable and that the Forest Service is subject to NEPA requirements under certain circumstances.I. Background
 
 
 2
 This is a controversy over the proper way to use and manage the timber resources within the national forests in Texas. The plaintiffs assert that the Forest Service should consider the use of a system for managing trees called uneven-aged management. In that system timber is allowed to grow in stands containing trees of different ages. Because the trees mature at varying times, selective cutting is used to harvest them. In selective cutting trees must be individually chosen and marked before they may be cut. In contrast, even-aged management, now used by the Forest Service, permits only trees of uniform age to grow within a stand. Intermediate thinnings weed out trees of less maturity prior to a final harvest, which is generally made by seed tree cutting, shelterwood cutting or clearcutting.[5] When clearcutting is used, all timber in the area is removed in one cut and the area is prepared for either natural regeneration, artificial seeding or planting of nursery-grown trees. The net result of this method is that all of the trees in an area are leveled within inches of the ground.
 
 
 3
 The sale of timber in national forests was originally controlled by the Organic Act of 1897, 16 U.S.C. § 476. That act provided for the sale of "dead, matured, or large growth of trees." In 1960 Congress passed the Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528-31. The Multiple-Use Sustained-Yield Act stated a congressional policy that national forests were established and were to be administered for outdoor recreation, range, timber, watershed, wildlife and fish purposes. It also provided that the Secretary of Agriculture was to develop and administer the renewable resources of the national forests for multiple use and sustained yields. The definition of "multiple use" as it pertains to timber manifested a congressional intent to balance the use of national forests between the one pole of timber production and the other of aesthetic and recreational use.[6] Congress passed the Multiple-Use Sustained-Yield Act without repealing the Organic Act of 1897.
 
 
 4
 Around 1964 the Forest Service began to implement the use of clearcutting in national forests. Conservation-oriented plaintiffs then sued, claiming that the Organic Act, 16 U.S.C. § 476, permitted harvesting of only a limited number of trees, specifically those that were dead, matured or of large growth. West Virginia Division of Izaak Walton League of America, Inc. v. Butz, 522 F.2d 945 (4 Cir. 1975). The Fourth Circuit upheld that argument and ruled that all contracts for the sale of timber which did not provide for selective, marked cutting of dead, matured, or large growth trees violated the Organic Act.
 
 
 5
 Congress responded to the Monongahela decision (as the Fourth Circuit case came to be called) with significant legislation. It repealed Section 476, the Organic Act, and passed the National Forest Management Act, 16 U.S.C. § 1600 et seq.
 
 
 6
 The East Texas litigation had, however, commenced before the passage of the National Forest Management Act. In 1976 plaintiffs filed a complaint asking for declaratory and injunctive relief and alleging that the defendants, by permitting clearcutting in East Texas national forests, were in violation of the Organic Act of 1897, the National Environmental Policy Act, 42 U.S.C. § 4332, the Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528 et seq., the Endangered Species Act, 16 U.S.C. § 1531 et seq., and the Wilderness Act, 16 U.S.C. § 1131. At the preliminary injunction stage the district court held that proposed timber sales in the East Texas forests violated the Organic Act of 1897 and that clearcutting violated the Multiple-Use Sustained-Yield Act. It also held that the Forest Service had violated the National Environmental Policy Act by failing to file an environmental impact statement concerning even-aged timber management practices in the Texas national forests. Just prior to the trial on the merits the National Forest Management Act was signed by the President. After the trial, the district court declined to rule that clearcutting was a violation of the National Forest Management Act, the Multiple-Use Sustained-Yield Act, the Endangered Species Act or the Wilderness Act. It did hold that failure to file an environmental impact statement for the Texas forests violated the National Environmental Policy Act.
 
 
 7
 The defendant Secretary has appealed that decision arguing that the district court's decision was an incorrect substitution of judicial opinion for that of the agency and Congress, that the district court erroneously required a programmatic environmental impact statement covering all East Texas forest land, that the NFMA affects the Secretary's responsibility under NEPA and that the injunction should not have been granted. The plaintiff appellees counter that the East Texas clearcutting program is a major federal action which requires the filing of an environmental impact statement, that there is no statutory exception which sanctions the failure to file an environmental impact statement and that the injunctive relief was a proper remedy for their complaint. They also argue that the NFMA neither exempted the Forest Service from the preparation of an environmental impact statement nor gave blanket permission for clearcutting.
 
 II. NEPA Compliance
 
 8
 An environmental impact statement is required for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421 (5 Cir. 1973); Simmans v. Grant, 370 F.Supp. 5 (S.D.Tex.1974). This circuit has determined that an agency's initial determination whether to file a statement is to be tested under a rule of reasonableness. Save Our Ten Acres v. Kreger, 472 F.2d 463, 465-66 (5 Cir. 1973). That rule of reasonableness does not apply, however, when there is a fundamental conflict of statutory purpose between NEPA and an agency's organic statute. Louisiana Power & Light Co. v. Federal Power Commission, 557 F.2d 1122 (5 Cir. 1977); Atlanta Gas Light Co. v. Federal Power Commission, 476 F.2d 142, 150 (5 Cir. 1973).
 
 
 9
 Appellants first argue that the National Forest Management Act, as construed by the district court, directly conflicts with the NEPA and that in such a situation the latter must yield. The statutory conflict exception has been applied sparingly. See generally, Note, The Environmental Impact Statement Requirement in Agency Enforcement Adjudication, 91 Harv.L.Rev. 815, 825 (1978). The conflict between the agency's organic statute and NEPA must be both fundamental and irreconcilable. Flint Ridge Development Co. v. Scenic Rivers Association, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205, reh. den. 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 159 (1976). In a limited number of cases statutorily mandated deadlines, Gulf Oil Corp. v. Simon, 373 F.Supp. 1102 (D.D.C.), aff'd, 502 F.2d 1154 (Em.App.1974), or an indispensable need for haste, Atlanta Gas Light Co., supra, have rendered compliance with NEPA impossible. In a small number of cases NEPA compliance has not been required when the agency's organic legislation mandated specific procedures for considering the environment that were "functional equivalents" of the impact statement process. Environmental Defense Fund, Inc. v. Environmental Protection Agency, 160 U.S.App.D.C. 123, 489 F.2d 1247 (1973); Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973).
 
 
 10
 We must, therefore, examine the NFMA to determine whether it falls within one of these narrow exceptions to NEPA. Section 1604(g) of the NFMA states that as soon as practicable, but not later than two years after October 22, 1976, the Secretary shall, in accordance with procedures set forth in section 553 of title 5, promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans. The guidelines and standards prescribed by that subsection are to include specific procedures to ensure that land management plans are prepared in accordance with the NEPA of 1969 and must give direction on when and for what plans an environmental impact statement is required.
 
 
 11
 Later subsections of section 1604(g) mandate the composition of guidelines that will ensure consideration of the economic and environmental aspects of various systems of renewable resource management and that will ensure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stands of timber will be used only when clearcutting has been determined to be the optimum method or other cuts have been determined to be appropriate, when an interdisciplinary review, as determined by the Secretary, has been completed and the potential environmental, biological, aesthetic, engineering and economic impacts on each potential timber sale have been assessed. 16 U.S.C. § 1604(g)(3)(F).
 
 
 12
 We do not think that the specific timetable laid down in section 1604(g) of the NFMA demonstrates a direct conflict between that statute and NEPA. In Louisiana Power & Light Co. v. Federal Power Commission, 557 F.2d 1122 (5 Cir. 1977), the power and light company argued that the Commission was required to file an environmental impact statement before imposing a three-priority plan for natural gas curtailment. The Commission had ordered preparation of an EIS for the permanent curtailment plan, but had determined that an EIS for interim plans was not required. Statutorily the FPC was required to take "prompt action" in determining which of the priority plans would be used. This court held that the Commission could not take the prompt action required by the statute and comply with the NEPA requirements. Louisiana Power establishes a rule that once it can be shown that the agency whose action is challenged can comply with NEPA and execute its statutory responsibility, the agency has a clear responsibility to examine the environmental implications of its action through the formal process that NEPA prescribes.
 
 
 13
 The timetable in section 1604(g) established October 1978 as the deadline for the development of particular departmental procedures to ensure compliance with both NEPA and the Multiple-Use Sustained-Yield Act of 1960 and for developing comprehensive resource management plans. We are certain, however, that Congress did not intend entirely to exempt the Forest Service from NEPA compliance in establishing those new management guidelines. The legislative history of NFMA reveals as much. The Senate Report on the NFMA, commenting on the portion of the bill that later became section 1604 noted that the paragraph requiring assurance that plans for land management were to be developed in accordance with the NEPA did not alter the responsibilities of the Forest Service to comply with both NEPA and CEQ guidelines. Sen.Rep.No.94-893, U.S.Code Congressional & Administrative News, 94th Cong., 2nd Sess. 1976 at pp. 6673-74. The Committee consideration of the bill stated that:In requiring the Secretary to promulgate regulations that set out the land management planning process, the bill specifically requires that he describe how the interdisciplinary approach will be used, the type of plans that will be prepared and their relationship to the Program, the procedures to insure public participation, and the procedures for coordinating the preparation of land management to insure that they are prepared in accordance with the National Environmental Policy Act of 1969. The regulations are to be consistent with Council on Environmental Quality guidelines, providing direction for situations requiring preparation of an environmental impact statement. The provision referring to the National Environmental Policy Act is neither intended to enlarge nor diminish the Forest Service's responsibilities under the Act.
 
 
 14
 Thus the final guidelines, as developed by the Forest Service over the two-year period must comply with NEPA, and they may, in certain cases require production of an environmental impact statement.
 
 
 15
 In the two-year interim, however, Congress contemplated that new environmental impact statements would be required only if interim guidelines required to be established within 120 days of the legislation's passage differed significantly from then current Forest Service guidelines. Id. at 6694. We interpret the congressional intent as one to forestall the necessity for an environmental impact statement solely because of the adoption of interim guidelines. Any change in Forest Service practice would have continued to require the preparation of an environmental impact statement. The agency action contemplated in this case, unlike that in Louisiana Power & Light, supra, or Atlanta Gas Light Co., supra, was expected to proceed over a substantial period of time. That factor alone would not necessarily be sufficient to demonstrate compatibility between NEPA and the challenged agency's organic statute. It is, however, a circumstance that we may consider. Taken with the substantial evidence, present in the legislative history, of congressional intent to harmonize the two statutory schemes, it impels us to conclude that compliance with the NFMA does not necessarily preclude NEPA compliance.
 
 
 16
 We are also unpersuaded that the type of case before us today is one that must fall within the exception to NEPA compliance permitted when the agency's organic legislation mandates specific procedures for considering the environment that are the functional equivalent of an environmental impact statement. Those exceptions have generally been limited to environmental agencies themselves. See Environmental Defense Fund, Inc. v. Environmental Protection Agency, supra. Unlike an agency whose sole responsibility is to protect the environment, the Forest Service is charged with the management of the nation's timber resources. Its duties include both promotion of conservation of renewable timber resources and a duty to ensure that there is a sustained yield of those resources available. As the legislative history of the NFMA clearly points out, the Forest Service must balance environmental and economic needs in managing the nation's timber supply. The careful considerations mandated by section 1604(g) do not exempt the Forest Service from preparation of environmental impact statements.
 
 
 17
 We hold today that there is no irreconcilable conflict between the imposition of NFMA guidelines and NEPA compliance. The enactment if NFMA does not except the Forest Service from NEPA compliance when it develops permanent resource management guidelines. Nor is the Forest Service excepted in the interim period when the adopted interim management guidelines differ significantly from then current guidelines. Thus, clearcutting in the East Texas national forests under interim guidelines does not require an environmental impact statement, but the move toward implementation of a land management program under section 1602 of the NFMA may require such a statement.III. Clearcutting in the East Texas National Forests
 
 
 18
 Both the defendant-appellants and the intervenor-appellants argued that the district court had impermissibly substituted its judgment for that of Congress in determining that no further clearcutting should be permitted in the East Texas national forests until an environmental impact statement was filed. We agree. Unlike an agency decision to pursue action which has significant potential environmental effects, a congressional decision that such an action may proceed is not subject to judicial review. Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 492 F.2d 1123, 1140 (5 Cir. 1974). The legislative history of the NFMA shows that Congress gave full attention to environmental and economic concerns inherent in managing the nation's renewable timber resources.[7] The congressional committee clearly recognized the significant impact of clearcutting in national forests:
 
 
 19
 Clearcutting and other harvest systems aimed at creating even-aged stands result in sudden ecological change. The impacts on esthetics and other forest values are preceived as being more immediately significant than those associated with uneven-aged management. Therefore, the Committee believes that special consideration is needed to assure proper use of these systems. This does not mean that other systems are not to be applied with equal care.
 
 
 20
 The term "optimum method" means it must be the most favorable or conducive to reaching the specified goals of the management plan. This is, therefore, a broader concept than "silviculturally essential" or "desirable" terms considered and rejected by the Committee.
 
 
 21
 The Committee had substantial discussion over how to define when it was appropriate to use even-aged management systems. There was full agreement that the decision should not be based solely on economic benefits, i. e., dollar benefits or dollar returns. Rather, the full scope of environmental effects (natural, economic and social) should be evaluated and even-aged systems should be used only when they best meet forest management objectives for the individual management plan. Further, the monitoring, evaluation and research processes will be used in the process.
 
 
 22
 The size of clearcutting units had been a subject of wide public comment and Committee consideration. The Committee expects the Secretary to establish appropriate limits on size of units to be cut based on the best available scientific evidence, management plan goals, and the guides in this bill on overall decision making. The Committee expects the Secretary to write specific guidelines and hold the average size of clearcuts as low as practicable.
 
 
 23
 The Committee also notes that in addition to size, such factors as the slope of cutting units, the proximity of units, one to another, the relationship of units to natural openings, and the effect on esthetics and other resource values must be considered.
 
 
 24
 However, the Committee intends that cuts will be shaped and blended whenever possible.
 
 
 25
 Nevertheless the Senate-House conference agreed that the Forest Service should be permitted to continue clearcutting under the Church guidelines[8] pending development of management plans required by the NFMA. Senate-House Conference Committee Report, U.S.Code Congressional & Administrative News, 94th Cong., 2nd Sess. 1976 at p. 6726. That congressional determination precludes further inquiry by this court.
 
 
 26
 We hold today that the congressional decision to permit clearcutting in national forests under the Church guidelines is not subject to judicial review during the period in which permanent guidelines are being established. This holding implicitly carries with it a rule that the decision is not subject to indirect review through the process of requiring an environmental impact statement before pursuing the congressionally determined course of interim action.
 
 
 27
 The Supreme Court has recently reminded lower federal courts that fundamental policy questions appropriately resolved in Congress and the state legislatures are not subject to re-examination in the federal courts under the guise of judicial review of agency action. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In this case that command is buttressed by the congressional action. The Church guidelines were incorporated into the National Forest Management Act. 16 U.S.C. § 1604(g). The decision was reached after the committees involved heard testimony that resulted in a record of over a thousand pages. Individuals testified on both sides of the clearcutting issue. That testimony emphasizes the extremely delicate balance struck by Congress in this matter. On the one hand, Congress faced an abundance of testimony that pervasive clearcutting was destructive of the scenic quality of the nation's forests and was damaging to the natural eco-system; on the other, representatives of the lumber and housing industry testified that abolition of clearcutting would have a drastic impact on the price of building material and the national housing shortage. The congressional response, embodied in the Church guidelines and the NFMA, was an attempt to salvage the territory between two extremes. It was also an effort to place the initial technical, management responsibility for the application of NFMA guidelines on the responsible government agency, in this case the Forest Service. The NFMA is a set of outer boundaries within which the Forest Service must work. Within its parameters, the management decision belongs to the agency and should not be second-guessed by a court.
 
 
 28
 IV. The Programmatic Environment Impact Statement
 
 
 29
 The district court held that an over-all or programmatic environmental impact statement was required. We think that conclusion was error under Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The Supreme Court rejected an argument that a federal agency involved in granting coal leases in the Northern Great Plains was required by section 102(2)(C) of the NEPA to file a regional "programmatic study". 96 S.Ct. at 2732. The Court noted the respondents' contentions that the environmental relationship of the whole area would be affected through the cumulative impact of successive projects. Nevertheless, the Court stated:
 
 
 30
 Respondents' contentions (of environmental and geographical relationships) do not require that petitioners prepare one comprehensive impact statement covering all before proceedings to approve specific pending applications.
 
 
 31
 The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.
 
 
 32
 That language applies equally in the case before us. Plaintiffs have failed to show arbitrary agency action in preparing individual impact statements for the relevant forests.
 
 V. The Conroe Unit Impact Statement
 
 33
 The district court also held that the environmental impact statement for the Conroe Unit of the Sam Houston National Forest was insufficient in a number of respects. It first noted that the impact statement discussed only clearcutting as a method of sawlog harvesting and that it barely mentioned the selective harvesting principle. The impact statement contains a review of alternatives explored at the Charette[9] held on September 20-October 3, 1974. That Charette was one part of a public discussion of Forest Service management held throughout the East Texas area in connection with development of NFMA guidelines. Issue Number Seventeen at that Charette involved the production of wood products. One of the three management alternatives produced for that issue was to practice highly modified forestry with the objective of producing high yields of recreation, wildlife and natural scenery with reduced timber yields. That option was not the ultimate management option chosen by the Charette, but we think its substance was sufficiently close to the uneven-aged management concept to demonstrate that consideration was given to other silvicultural systems. There is no evidence in the record that the Charettes were not conducted in good faith. The number of ecology-oriented participants was approximately equal to the twenty-eight or so participants who were identifiable as Forest Service connected. About seventeen were recognizable as lumber company representatives. No group who used the national forests appears to have been intentionally excluded. We think that the process used and the statement that it produced are sufficient to pass muster under NEPA.
 
 VI. Injunctive Relief
 
 34
 Because it perceived both outright violations of NEPA and inadequate compliance with NEPA, the district court enjoined further clearcutting in the national forests of Texas until the Forest Service filed a programmatic environmental impact statement, which had been reviewed by the district court, with the Council on Environmental Quality. We think the relief granted was too broad. As we have said before, the Forest Service may not avoid the preparation and filing of an environmental impact statement as it develops new management guidelines pursuant to the NFMA. Congress, however, has determined that clearcutting may continue under restrictive guidelines until final management practices are established under the NFMA. In overriding that decision the district court abused its discretion. It naturally follows that the grant of injunctive relief, an extraordinary remedy, was error. We hold today that the injunction is dissolved and we reverse the district court insofar as it purported to require a programmatic impact statement, held the Conroe statement insufficient or set out specific guidelines for future environmental impact statements. We hold that the Forest Service is entitled to pursue clearcutting in the National Forests of Texas under the Church guidelines until the permanent guidelines under the NFMA are applicable. We also hold that the Forest Service must prepare environment impact statements as dictated by the NFMA and that it is responsible for the development of management guidelines that conform to the NFMA.
 
 
 35
 We would emphasize that our decision today is not a wholesale license to clearcut in Texas forests. Both the Church guidelines and the NFMA express serious reservations about the practice that may not be disregarded by the Forest Service in developing permanent guidelines. The NFMA specifically notes that clearcutting may not be adopted simply because it gives the greatest dollar return per unit output. Rather clearcutting must be used only where it is essential to accomplish the relevant forest management objectives. The development of those management policies remains the province of the Forest Service, subject to the restrictions placed on it by Congress. A decision to pursue even-aged management as the over-all management plan under the NFMA is subject to the narrow arbitrary and capricious standard of review. The district court incorrectly determined that the decision was arbitrary and capricious. For that reason, as well as those stated above, the district court's injunction is ordered dissolved and the mandate in this case shall be issued forthwith. Rule 41 Fed.R.App.Pro.
 
 
 36
 REVERSED.
 
 
 37
 GOLDBERG, Circuit Judge, concurring in part and dissenting in part:
 
 
 38
 I concur in Parts I, IV, and V of the majority opinion without reservation. I also concur in so much of Parts II, III, and VI of the majority opinion as hold that there is no irreconcilable conflict between NEPA and NFMA, that environmental impact statements (EIS's) must be prepared whenever interim management guidelines differ significantly from guidelines in effect at the date of passage of NFMA, that EIS's are required in connection with the development of permanent resource management guidelines, and that the district court's prohibition of all clearcutting in the national forests of Texas pending compliance with NEPA must be reversed. My dispute with the majority is, therefore, narrow.
 
 
 39
 The majority holds that clearcutting in the East Texas national forests under the interim guidelines does not require an EIS so long as the clearcutting is conducted under the Church guidelines. The majority gives insufficient weight to NEPA's explicit command that "to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter . . . ." 42 U.S.C. § 4332. (Emphasis added.) Here, the Forest Service, the agency upon whose shoulders will rest any burden of preparing an EIS, has stated that it accepts the obligation to prepare EIS's during the interim period even when the forests continue to be managed under existing plans. The Forest Service asks only that it be permitted to continue existing clearcutting programs while preparing an EIS in regard to them.[1]
 
 
 40
 Fidelity to NEPA's command that its policies be honored "to the fullest extent possible" compels me to conclude that interim management under existing plans requires an EIS. The congressional determination that clearcutting be permitted in the interim period where consistent with the Church guidelines only underlines the desirability of an EIS to assist in evaluating the compatibility of particular clearcutting programs with the Church guidelines. The EIS is the primary mechanism to insure that agencies have fully considered the environmental impacts of their decisions. This function is as essential with respect to interim management under existing plans as with respect to interim management under new plans.
 
 
 41
 I would permit clearcutting to proceed under existing plans while requiring the Forest Service to prepare expeditiously an EIS. This approach would honor the congressional determination in NFMA that clearcutting go forward and, at the same time, insure adequate assessment of management alternatives for tracts remaining after completion of the EIS. I, therefore, must respectfully dissent from this portion of the court's holding.
 
 
 
 [1]
 Plaintiff organization is a voluntary organization supported by contributions from individual members. Various members of the organization make use of the National Forests of Texas for recreational purposes. The organization had standing to prosecute this complaint under Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)
 
 
 [2]
 Defendant Bergland was automatically substituted as a defendant pursuant to F.R.C.P. 25(d)
 
 
 [3]
 Defendant John McGuire, Chief, Forest Service, Department of Agriculture, and John Courtenay, Forest Supervisor, National Forest in Texas
 
 
 [4]
 Oliver Bros. Lumber Co., Inc.; Champion International Inc.; Conroe Creosoting Co.; L. R. Davis; Leggett Lumber Co., Inc.; Louisiana-Pacific Corp.; Owens Illinois, Inc.; Southland Paper Mills, Inc.; Walker Bros., Inc.; Williams Lumber Co., Inc.; Woodville Lumber Co.; A. A. Giles Bros. Lumber Co.; Davis Pulpwood Co.; Bob Currie; and Jack Alexander, Inc
 
 
 [5]
 Seed tree cutting means that certain trees are left for the purpose of seeding the surrounding ground. Under shelterwood cutting systems enough trees are left to protect immature trees against exposed conditions
 
 
 [6]
 16 U.S.C. § 531 states that:
 As used in sections 528 to 531 of this title, the following terms shall have the following meanings:
 (a) "Multiple use" means: The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.
 (b) "Sustained yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.
 Pub.L. 86-517, § 4, June 12, 1960, 74 Stat. 215.
 
 
 [7]
 In addition to consideration of environmental and economic problems, Congress evidenced specific concern over what was apparently the district court's preliminary injunction order. Senator Humphrey noted the need for congressional action stating:
 Since the committees reported S. 3091, a district court judge in Texas has announced that, in addition to being in violation of the Organic Act, clear cutting, as practiced in the case before that court, was also in violation of the Multiple-Use Sustained-Yield Act.
 
 
 [122]
 Cong.Rec. S. 14496 (daily ed. Aug. 25, 1976). We assume that Senator Humphrey's reference was to the present litigation. We have found no other reported Texas cases and the parties have not directed our attention to other cases concerning Texas forests. The congressional debates, therefore, show not only general concern for the national forests of the entire country, but a specific congressional intention to permit clearcutting in the Texas forests
 
 
 [8]
 The Church guidelines are included in a sub-committee report on harvesting guidelines. They state:
 
 
 [2]
 Harvesting limitations
 Clear-cutting should not be used as a cutting method on Federal land areas where:
 a. Soil, slope or other watershed conditions are fragile and subject to major injury.
 b. There is no assurance that the area can be adequately restocked within five years after harvest.
 c. Aesthetic values outweigh other considerations.
 d. The method is preferred only because it will give the greatest dollar return or the greatest unit output.
 
 
 [3]
 Clear-cutting should be used only where:
 a. It is determined to be silviculturally essential to accomplish the relevant forest management objectives.
 b. The size of clear-cut blocks, patches or strips are kept at the minimum necessary to accomplish silvicultural and other multiple-use forest management objectives.
 c. A multidisciplinary review has first been made of the potential environmental, biological, aesthetic, engineering and economic impacts on each sale area.
 d. Clear-cut blocks, patches or strips are, in all cases, shaped and blended as much as possible with the natural terrain.
 
 
 [4]
 Timber sale contracts
 Federal timber sale contracts should contain requirements to assure that all possible measures are taken to minimize or avoid adverse environmental impacts of timber harvesting, even if such measures result in lower net returns to the Treasury.
 
 
 [9]
 The term charette generally means the intense final effort made by architectural students to complete their solutions to a given architectural problem in an allotted time or the period in which such an effort is made. Webster's Third New International Dictionary (G. C. Merriam & Co. 1964). The Forest Service applied the term to its small group public discussions that were held as required by the NFMA. Representatives from conservation groups, the lumber industry and the general public were invited to participate in intensive discussions in an effort to develop a consensus of opinion on general forest management directions
 
 
 [1]
 The brief for the federal appellants is clear on this point. Disclaiming any suggestion that NFMA granted the Forest Service unqualified permission to embark on significant new activities or projects without first filing an EIS, the Forest Service also conceded
 that when a national forest is being managed in accordance with existing land use plans which do not significantly threaten the environmental "status quo," such continuing activities may be carried out pending completion of an EIS, providing that the Forest Service is moving expeditiously to complete the EIS within a reasonable time period . . . . Further, as previously discussed, the Forest Service was committed to preparing EIS's on continuing management activities before this action was commenced and it remains committed to the goal of preparing and filing such EISs as expeditiously as possible.