**STATE OF ALABAMA, ex rel. Don SIE-GELMAN, Attorney General, Alabamians For a Clean Environment, Sierra Club–Alabama Chapter, Alabama Conservancy and Greenpeace, U.S.A., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lee Thomas, in his official capacity as Administrator of the Environmental Protection Agency, Respondents,**

**Chemical Waste Management, Inc., Intervenor.**

No. 88–7523.

United States Court of Appeals, Eleventh Circuit.

Aug. 23, 1990.

Don Siegelman, Atty. Gen., C. Dean Monroe, III, Asst. Atty. Gen., Montgomery, Ala., for petitioner.

Gary Davis, Knoxville, Tenn., for Alabamians for a Clean Environment, et al.

W. Christian Schumann, U.S. Dept. of Justice, Fredric D. Chanania, U.S.E.P.A., Office of Gen. Counsel, Washington, D.C., Elizabeth Osheim, Philip G. Mancusi–Ungaro, U.S.E.P.A., Region IV, Hazardous Waste Law Branch, Atlanta, Ga., for U.S. E.P.A.

J. Brian Molloy and Mary F. Edgar, Piper & Marbury, Washington, D.C., Fournier J. Gale, III, Jarred O. Taylor, II, Maynard Cooper, Frierson & Gale, Birmingham, Ala., for Chemical Waste Management, Inc.

Before EDMONDSON, Circuit Judge, HILL* and HENDERSON, Senior Circuit Judges.

EDMONDSON, Circuit Judge:

Pursuant to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k (1982 & Supp. V 1987) ("RCRA"), the Environmental Protection Agency ("EPA") issued a final operating permit for the nation's largest hazardous waste management facility, located at Emelle, Alabama. We are asked to decide whether EPA's procedures in issuing the permit were sufficient to exempt EPA from performing an environmental impact study in compliance with the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370b (1982 & Supp. V 1987) ("NEPA"). The answer is "Yes." We are also asked to decide whether EPA violated its own procedural requirements governing public participation and whether EPA's waiver of a ground water monitoring requirement was arbitrary and capricious. The answer is "No." We affirm the EPA Administrator's decision to uphold EPA's issuance of the permit for the Emelle facility.

## I. BACKGROUND

The Emelle facility, owned and operated by Chemical Waste Management, Inc. ("ChemWaste"), receives hazardous wastes from forty-eight states. The facility covers 2730 acres of land and includes twenty inactive landfill trenches, one active trench, an aqueous waste storage pond, a waste drum storage area, a liquid waste tank storage area, a liquid waste solidification unit, and a solvent and fuel recovery area. Emelle receives almost every type of haz-

ardous waste identified in the RCRA regulations at 40 C.F.R. Part 261, including waste that is toxic, corrosive, flammable, and reactive, but does not accept municipal refuse or garbage, radioactive wastes, or explosive wastes.

RCRA, which establishes a "cradle-to-grave" system for regulating the treatment, storage, and disposal of hazardous wastes, requires hazardous waste management facilities like Emelle to receive an operating permit from EPA.[1] See 42 U.S.C. § 6925. Alabama requires that hazardous waste management facilities also obtain an operating permit from the state, see Ala.Code § 22–30–12 (1989); such permits are issued by the Alabama Department of Environmental Management ("ADEM").

Under RCRA, facilities that were already in operation in November 1980 are allowed to continue operating on an interim basis until a final permit can be issued.[2] See 42 U.S.C. § 6925(e). ChemWaste, operating the Emelle facility under an interim permit, filed its application for a final permit in 1983. ChemWaste's application requested authority to operate the facility permanently and to expand the facility. ChemWaste proposed adding four landfill trenches and a large amount of container storage facilities and asked for a waiver of ground water monitoring relative to the landfill disposal.[3]

EPA's Regional Office, after determining that ChemWaste's application for a final RCRA permit was complete, issued a "draft" permit in 1986, commencing a period for public hearing and comments. Jointly with ADEM, EPA held a public hearing

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. Under RCRA, a state may adopt a hazardous waste management program which both the state and EPA will enforce in that state in lieu of RCRA, provided the state program meets certain criteria. See 42 U.S.C. § 6926(b); 40 C.F.R. § 271.4. If a state has such a program in place, the state has responsibility for issuing RCRA permits. When ChemWaste applied for its final permit, the State of Alabama had no such program in place; so, EPA was the RCRA permitting entity.

2. Final permits are sometimes referred to as "Part B" permits because Part A of the permit application requests interim operating status and Part B requests the final authorization.

3. ChemWaste also proposed constructing an incinerator which would allow the Emelle facility to burn several types of wastes that, under federal regulation, may no longer be disposed of in landfills. EPA authorized construction of an incinerator, but ChemWaste later abandoned the plan, and EPA modified the final permit to terminate approval for the incinerator.

in Alabama and accepted and responded to comments from interested parties.[4] In 1987, EPA issued the final permit for the Emelle facility, approving ChemWaste's proposed expansions and waiving certain ground water monitoring requirements.[5] To our knowledge, ADEM has not issued a final state permit; ADEM's actions are not challenged in this appeal.

When EPA issued Emelle's permit, EPA did not prepare an environmental impact study ("EIS") under NEPA. EPA followed one of its own regulations, promulgated in 1980 shortly after RCRA took effect, which states EPA's position that the RCRA permit process supplants the requirements of NEPA and that EPA need not comply with NEPA when granting RCRA permits. *See* 40 C.F.R. § 124.9(b)(6).[6]

The petitioners in this case are the State of Alabama and four citizen organizations: Alabamians for a Clean Environment; the Alabama Chapter of the Sierra Club; the Alabama Conservancy; and Greenpeace, U.S.A. Petitioners appealed the EPA Regional Office's issuance of ChemWaste's permit to the EPA Administrator, who refused to rescind Emelle's permit, ruling that EPA had not violated NEPA because the RCRA permit process was functionally equivalent to the requirements of NEPA. The Administrator also said that EPA had satisfied all procedural requirements for

issuing the permit and had not acted arbitrarily in allowing a waiver of ground water monitoring. The Administrator's decision is the basis of this appeal.[7] Under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1982), our role is to determine: (1) whether EPA acted within the scope of its authority; (2) whether EPA's decision to issue the permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and (3) whether EPA followed procedural requirements in issuing the permit. *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971).

## II.  DISCUSSION

### A.  *Collateral Estoppel*

■ Following EPA's public meeting to accept oral comments on the draft permit, the four citizen organizations aligned as petitioners in this case brought an action in federal district court in Alabama. *See Alabamians for a Clean Environment v. EPA*, 26 ERC 2116 (N.D.Ala.1987). The citizen organizations asked the district court to enjoin EPA from issuing a final permit for Emelle; the organizations argued that EPA was required to perform an EIS in compliance with NEPA. The district court refused to grant the injunction

---

**4.** Petitioners submitted written comments and presented comments orally at the public meeting.

**5.** Although RCRA refers to the permit as "final," Emelle's permit has a term of seven years and may be thereafter renewed. *See* 40 C.F.R. § 270.51 for a description of renewal procedures.

**6.** The pertinent part of 40 C.F.R. § 124.9(b)(6) provides that "all RCRA permits ... are not subject to the environmental impact statement provisions of section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. 4321."

Under RCRA, parties wishing to challenge an EPA regulation must file a petition for review in the District of Columbia Circuit Court of Appeals within ninety days after promulgation. *See* 42 U.S.C. § 6976(a)(1). EPA argues here that, because petitioners never directly challenged regulation section 124.9(b)(6) in this statutorily required manner, they may not now

challenge the regulation indirectly by appealing EPA's decision to grant a permit to the Emelle facility. We disagree. This court would have no jurisdiction to entertain a challenge to a RCRA regulation on the ground that EPA did not follow proper procedures in promulgating the regulation. But we do have jurisdiction to consider the argument that EPA's regulation conflicts with an act of Congress.

**7.** Petitioners bring their appeal directly to this court because RCRA vests jurisdiction to review the Administrator's final decision in the court of appeals rather than in the district court.

Review of the Administrator's action (1) in issuing ... any permit under section 6925 of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.... Such review shall be in accordance with section 701 through 706 of Title 5.

42 U.S.C. § 6976(b).

and instead dismissed the case for failure to state a claim under Fed.R.Civ.P. 12(b)(6), ruling that EPA was not obliged to comply with NEPA when exercising its permitting authority under RCRA. The district court said that RCRA placed requirements on EPA that were functionally equivalent to the requirements of NEPA. The citizen organizations did not appeal.

EPA contends that the issue of whether it was required to perform an EIS in compliance with NEPA is barred in this case by collateral estoppel.[8] Petitioners here concede that they are raising the identical issue of whether EPA was required to comply with NEPA in issuing a RCRA permit to the Emelle facility, but petitioners urge this court to conclude that the State of Alabama is not bound by the earlier decision.

We agree with petitioners that the State of Alabama is not precluded from pursuing this issue. Although ADEM, an Alabama state agency, was a defendant in the action in district court, ADEM was not involved in litigating the question of EPA's duties in the light of NEPA. ADEM was a defendant under a separate count of the complaint that alleged a due process violation in connection with the state's permitting procedures.[9] Accordingly, even if Alabama is in privity with ADEM, neither ADEM nor Alabama are bound by the district court decision on an issue arising between other parties and not affecting ADEM. *See Stryker v. Crane*, 123 U.S. 527, 538–39, 8 S.Ct. 203, 208–09, 31 L.Ed. 194 (1887); *Stafford v. General Supply Co.*, 5 Wis.2d 137, 92 N.W.2d 267, 271 (Wis.1958); *see also Hurt v. Pullman, Inc.*, 764 F.2d 1443, 1448–50 (11th Cir.1985). Put differently, because the plaintiffs stated no cause of action against and sought no relief from ADEM on account of EPA's refusal to follow NEPA, and because ADEM filed no cross-claim against EPA on the question, ADEM was not a party to the litigation of the NEPA issue in district court.[10]

## B. *Compliance with NEPA*

By enacting NEPA, Congress declared a broad national commitment to protecting and promoting environmental quality. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989). To ensure that this commitment is implemented throughout the federal government, NEPA forces federal agencies to prepare detailed studies of the environmental effects of their actions. These studies serve two important purposes: (1) the agency is forced to consider carefully detailed information about significant environmental impacts; and (2) relevant environmental information is made available to the members of the public, who can then play a role in the agency's decisionmaking process and implementation of that decision. *See Robertson*, 490 U.S. at ——, 109 S.Ct. at 1845.

NEPA requires that "to the fullest extent possible . . . all agencies of the Federal

8. The doctrine of collateral estoppel precludes relitigation of an issue that was actually litigated in an earlier lawsuit. Several prerequisites must be satisfied:
   (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action. In addition, the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.
   *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir.1985).

9. The district court dismissed this claim for lack of jurisdiction, finding ADEM's action not final and appealable because the plaintiffs had not received state agency review of ADEM's permitting decision.

10. We reject petitioners' argument that the issue was not actually litigated by anyone in the district court. The issue was dismissed for failure to state a claim. That "[a] dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits'" is well established. *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 2428 n. 3, 69 L.Ed.2d 103 (1981); *see also Legal Envtl. Assistance Found., Inc. v. Pegues*, 904 F.2d 640, 642 (11th Cir.1990); *Spiegel v. Continental Illinois Nat'l Bank*, 790 F.2d 638, 644–45 (7th Cir.1986); *Micklus v. Greer*, 705 F.2d 314, 417 (8th Cir.1983).

government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action...." 42 U.S.C. § 4332. So, a federal agency must ordinarily prepare an EIS whenever the agency's action will have a significant effect on the environment. *See Environmental Defense Fund, Inc. v. EPA,* 489 F.2d 1247, 1255 (D.C.Cir.1973).

No one disputes that EPA's action in granting a final operating permit to the nation's largest commercial hazardous waste management facility—a facility that handles almost every type of hazardous waste identified by RCRA regulations—is a "major Federal action" that will significantly affect the human environment. The parties in this case, however, disagree about whether EPA had to comply with NEPA's EIS requirements. EPA contends that RCRA's permit issuance process takes the place of NEPA. In other words, EPA contends that, in the context of approving operating permits for hazardous waste management facilities, RCRA functions as the equivalent and more specific legislative safeguard of the environment. But petitioners contend that NEPA applies to EPA's action under RCRA and that RCRA is not functionally equivalent to NEPA.

We are not the first judges called upon to decide whether NEPA applies to actions taken by EPA. Although NEPA says that "all agencies" must comply with its terms, most circuits have already recognized—in some instances, as many as seventeen years ago—that an agency need not comply with NEPA where the agency is engaged primarily in an examination of environmental questions and where "the agency's organic legislation mandate[s] specific procedures for considering the environment that

[are] functional equivalents of the impact statement process." *Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201, 207 (5th Cir.1978).[11] *See also, e.g., State of Wyoming v. Hathaway,* 525 F.2d 66, 70 (10th Cir.1975); *Indiana & Michigan Elec. Co. v. EPA,* 509 F.2d 839, 843 (7th Cir.1975); *South Terminal Corp. v. EPA,* 504 F.2d 646, 676 (1st Cir.1974); *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 380 (D.C.Cir.1973); *Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 174 (6th Cir.1973); *Appalachian Power Co. v. EPA,* 477 F.2d 495, 508 (4th Cir.1973).

This idea of limiting the sweep of NEPA stems, in part, from the traditional view that specific statutes prevail over general statutes dealing with the same basic subjects. *See Merrell v. Thomas,* 807 F.2d 776, 778, 779 (9th Cir.1986) (NEPA inapplicable where Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136–136y (1982 & Supp. V 1987), provided more specific registration requirements). *See generally Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980) (more specific statute is given precedence over more general one, regardless of temporal sequence). NEPA is the general statute forcing agencies to consider the environmental consequences of their actions and to allow the public a meaningful opportunity to learn about and to comment on the proposed actions. If there were no RCRA, NEPA would seem to apply here. But RCRA is the later and more specific statute directly governing EPA's process for issuing permits to hazardous waste management facilities. As such, RCRA is an exception to NEPA and controls here.

Petitioners complain, and EPA agrees, that RCRA does not require EPA to consider every point the agency would have to consider in preparing a formal EIS under

---

11. [The courts have seen] little need in requiring a NEPA statement from an agency whose raison d'être is the protection of the environment and whose decision ... is necessarily infused with the environmental considerations so pertinent to Congress in designing the statutory framework. To require a "statement," in addition to a decision setting forth

the same considerations, would be a legalism carried to the extreme.
*International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 650 n. 130 (D.C.Cir.1973). *Accord Amoco Oil Co. v. EPA,* 501 F.2d 722, 749–50 (D.C.Cir.1974); *Environmental Defense Fund,* 489 F.2d at 1256.

NEPA; thus, NEPA and RCRA conflict. Still, RCRA is the functional (though not the structural or literal) equivalent and more specific counterpart of NEPA.[12] RCRA is comprehensive in its field of application. RCRA's substantive and procedural standards are intended to ensure that EPA considers fully, with the assistance of meaningful public comment, environmental issues involved in the permitting of hazardous waste management facilities. The RCRA permitting procedures "strike a workable balance between some of the advantages and disadvantages of full application of NEPA." *Portland Cement,* 486 F.2d at 386 (finding section 111 of Clean Air Act functionally equivalent to NEPA); *see Amoco Oil Co.,* 501 F.2d at 750; *Warren County v. State of North Carolina,* 528 F.Supp. 276, 287 (E.D.N.C.1981).[13]

> NEPA's environmental impact statement is merely an implement devised by Congress to require government agencies to think about and weigh environmental factors before acting. Considered in this light, an organization like EPA whose regulatory activities are necessarily concerned with environmental consequences need not stop in the middle of its proceedings in order to issue a separate and distinct impact statement just to be issuing it. To so require would decrease environmental protection activity rather than increase it.

*Hathaway,* 525 F.2d at 71–72 (footnote omitted). We believe that Congress did not intend for EPA to comply with NEPA when RCRA applies to the particular EPA activity. We hold that, in considering ChemWaste's application for a final permit for the Emelle facility, EPA did not have to comply with NEPA.

**C. Compliance with Procedural Requirements**

■ Petitioners contend that EPA violated its own procedural regulations and policies in issuing the Emelle permit. Specifically, petitioners claim that EPA: (1) had extra-record communications with ChemWaste during the public comment period; (2) collected additional information after the close of the public comment period without reopening the comment period; (3) failed to provide a meaningful opportunity for the public to participate in the permitting process; and (4) failed to maintain objectivity in considering ChemWaste's application.

The first two allegations are improperly before us because petitioners failed to raise them on appeal to the EPA Administrator. Absent exceptional circumstances, "an appellate court should not overrule an administrative decision unless the administrative body erred against objections presented to it." *Taft v. Alabama By–Products Corp.,* 733 F.2d 1518, 1523 (11th Cir.1984) (citing *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952)). Petitioners argue that exceptional circumstances existed as a result of the administrative appeal process, but we do not think so.

Petitioners filed their administrative appeal by submitting a petition that requested the EPA Administrator's review, *see* 40 C.F.R. § 124.91; this petition did not raise the two pertinent procedural arguments. After the Administrator considered the petition, he accepted briefs on the only issue raised in the petition that he deemed worthy of review, an issue dealing with emis-

---

**12.** We note that courts in at least seven other circuits have recognized the functional equivalency doctrine, *see* cases cited in text following note 11 *supra,* and no court to our knowledge has rejected it. The District of Columbia, Fourth, and Sixth Circuits applied the doctrine as early as 1973, just three years after NEPA took effect. In the ensuing seventeen years, Congress has not seen fit to amend NEPA to disapprove the courts' application of the doctrine to actions taken by EPA. We know that Congress has occasionally expressly exempted

EPA action from NEPA. *See, e.g.,* 15 U.S.C. § 793(c)(1) (1982) (Clean Air Act); 33 U.S.C. § 1371(c)(1) (1982) (Water Pollution Control Act). We see this express exemption as Congress's way of making more obvious what would likely occur as a matter of judicial construction.

**13.** If RCRA does not represent the best policy for protecting the public welfare when EPA issues permits for hazardous waste facilities, Congress can, of course, change the law.

sions from the proposed incinerator. Because the Administrator declined to accept briefs on other issues, petitioners argue that they were never required to brief their procedural arguments fully. But even if petitioners were never required to brief the issues fully, they were required to raise them in their petition seeking the EPA Administrator's review. As it was, the Administrator had no chance to consider asking for briefs on these two issues.

■ Petitioners' second two allegations of procedural deficiency were considered and rejected by the EPA Administrator. We affirm the Administrator on those issues. First, we reject the argument that EPA failed to provide a meaningful opportunity for public participation (1) by making it difficult for members of the public to obtain information about the permit application; (2) by failing to provide such information in a form understandable by the public; and (3) by failing to conduct more than a "pro forma" public information meeting on the day of the public hearing. We see nothing in the record that would demand such a finding. EPA made available copies of relevant documents at the local public library, at the county probate judges' office, and at ADEM's trailer at the Emelle facility. EPA also made available to anyone who requested it a seventeen-page "fact sheet," which provided a detailed description of the draft permit and of procedures governing public comments. And although EPA held a public question and answer session on the same day as the public hearing, there was adequate time afterwards for additional written comments to be filed. EPA was required to leave the comment period open for only forty-five days, but it allowed eighty-six days; EPA received 145 written comments and 78 oral statements. We cannot say that EPA failed to provide a meaningful opportunity for public participation.

■ Second, we reject petitioners' contention that EPA lacked the necessary objectivity to make an impartial decision about ChemWaste's application because several former EPA officials now work for ChemWaste and because EPA uses the Emelle facility to dispose of hazardous waste generated in "Superfund" cleanups.[14] Neither of these allegations is sufficient to overcome the presumption that governmental officials perform their functions without bias.[15] *See Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982); *National Labor Relations Bd. v. Ohio New and Rebuilt Parts, Inc.*, 760 F.2d 1443, 1451 (6th Cir. 1985).

We have refused to invalidate an agency's decision on the ground of bias simply because a decisionmaker came to the regulatory agency from a regulated enterprise, recognizing that the same rule would apply when the decisionmaker left the agency to work for the regulated enterprise. *See Alabama Public Serv. Comm'n v. Interstate Commerce Comm'n*, 765 F.2d 1516, 1524 (11th Cir.1985). In addition, petitioners' bare allegation that EPA disposes of hazardous waste generated in federal cleanup operations at the Emelle facility does not show bias. If EPA's use of a commercial facility for disposal of Superfund wastes automatically biased EPA in RCRA permit proceedings, EPA might never issue a valid RCRA permit.

### D. *Waiver of Ground Water Monitoring Requirement*

■ RCRA and implementing regulations generally require hazardous waste management facilities to monitor the

---

**14.** "Superfund" is a fund established by Congress pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9602–9675 (1982 & Supp. V 1987) ("CERCLA"), so that the federal government would have money to finance or to assist states in financing cleanups of dangerous hazardous waste sites. *See* 40 C.F.R. Part 300, App. B (1989) (National Priorities List of designated Superfund sites).

**15.** Petitioners also claimed in their joint brief that the EPA Regional Administrator made at least one statement indicating that, prior to the comment period, he had supported incineration as a preferred method of waste disposal. We do not address this claim because EPA's approval of ChemWaste's proposed incinerator has been withdrawn and is not part of this appeal.

ground water for contaminants that might migrate from landfill disposal areas, unless a basis exists for EPA to grant a waiver. *See* 42 U.S.C. § 6924(*o*), (p); 40 C.F.R. Part 264, Subpart F. In the final permit for the Emelle facility, EPA included a provision that waived ChemWaste's obligation to monitor the ground water in the "uppermost aquifer," the closest significant water supply to the surface. *See* 40 C.F.R. §§ 170.2, 260.10 (defining "uppermost aquifer"). Petitioners argue that EPA's decision, finding a basis for the waiver, was arbitrary and capricious because the decision was based on erroneous conclusions of fact.

EPA may waive the ground water monitoring requirement in a final permit if the applicant facility shows that there is no potential for liquid wastes to migrate from landfill trenches into the uppermost aquifer during the period spanning both the active life of the landfill trench and the post-closure care of the trench. *See* 42 U.S.C. § 6924(p); 40 C.F.R. § 264.90(b)(4). EPA found that the uppermost water supply under the Emelle facility was 700 feet below the ground's surface. Petitioners contend that this determination is wrong because evidence of more shallow ground water exists. During the public comment period, petitioners brought to EPA's attention five shallow wells being used by residents of the Emelle area. EPA investigated these five wells, along with a sixth well that EPA itself discovered, and conducted tests to determine if the wells were being fed from a significant water source closer to the surface than 700 feet. EPA found that they were not.[16]

In addition, EPA found that the uppermost aquifer at the Emelle facility was protected by 700 feet of dense chalk. According to EPA, ChemWaste sufficiently demonstrated that liquid waste would not migrate from a landfill trench through this chalk and into the water supply in less than 300 years. The time projected for a landfill trench's active life and post-closure care at the Emelle facility totals forty years.

We cannot reverse EPA's decision to allow a ground water monitoring waiver: the agency's decision is within EPA's statutory authority, is not clearly wrong, and appears to be based on considered and carefully articulated expert opinion.[17] *See, e.g.,* EPA Memorandum, Waiver of 40 CFR 264 Subpart F Requirements for Releases into the Uppermost Aquifer from Regulated Units, & Attached Report from Golder Assocs., Consulting Geotechnical and Mining Engineers, dated March 25, 1987, ROA–Exh. 348; EPA Memorandum, Field Trip to Inspect Shallow Dug Wells in Sumter County, Alabama, dated March 27, 1987, ROA–Exh. 350. "Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on 'engineering and scientific' considerations, we recognize the relevant agency's expertise unless it is without substantial basis in fact." *Federal Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 (1972).[18]

AFFIRMED.

---

**16.** EPA determined, after conducting tests on these wells and after talking with the owners, that the wells were actually well/cisterns, which the owners supplemented with rain water.

**17.** We note that EPA did not waive all ground water monitoring requirements. Even though EPA did not find an aquifer closer to the surface than 700 feet, EPA found evidence that some ground water was located closer to the surface. EPA included an alternate monitoring provision in the final permit, requiring ChemWaste to monitor this shallow ground water for contaminants.

**18.** For similar reasons, we refuse to second-guess EPA's decision about the emergency preparedness and prevention provisions included in ChemWaste's final permit. Petitioners do not contend that EPA failed to consider these measures; the record shows that EPA considered the issues and made informed choices.

We also reject petitioners' contention that EPA's decision to grant the final permit was

arbitrary because EPA did not consider an independent environmental audit of the Emelle facility performed as part of a 1984 consent agreement between EPA, ADEM, and ChemWaste. EPA and ADEM had brought an administrative enforcement action against ChemWaste for alleged violations of interim status standards, codified at 40 C.F.R. Part 265. The environmental audit was not required by law or regulations and is not part of the final permit application. Before issuing ChemWaste's final permit, however, EPA determined that no outstanding violations of interim status standards existed; petitioners do not challenge this determination. Accordingly, petitioners' claim is without merit.